Donna **CARRILLO**, Plaintiff,

v.

Benjamin **WARD**, Commissioner of the New York City Police Department, and Edward **Roge** and Charles **Campisi**, Captains, New York City Police Department, Defendants.

No. 87 Civ. 7832 (WK).

United States District Court, S.D. New York.

June 4, 1991.

Rosemary Carroll, Kliegerman & Friess, New York City, for plaintiff.

Bonnie Mussman, Asst. Corp. Counsel, Corp. Counsel of City of New York, Law Dept., New York City, for defendants.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

This action is brought pursuant to 42 U.S.C. § 1983. Plaintiff is a female police officer who, at the time of the events underlying this suit, was employed by the New York City Police Department ("the Department"), and was assigned to work in a division known as the Manhattan Traffic Area ("Manhattan Traffic") commencing in June 1983. Defendant Captain Roge ("Roge") was the commanding officer of Manhattan Traffic from some time prior to 1983 through September 1986; defendant Captain Campisi ("Campisi") served as a sergeant and lieutenant under Roge, and succeeded him as commanding officer in October 1986. Both Roge and Campisi are sued in their individual capacities. Defendant Ward was the Police Commissioner for the years 1984 through 1990, and is sued only in his official capacity.[1] We shall

---

1. On its face the complaint appears to sue Ward in his individual capacity. However, plaintiff informs us that it is the intent of the complaint to sue Ward as the Commissioner of Police. Accordingly, for purposes of this motion we presume that the complaint has been amended to reflect the present Commissioner as the named defendant, sued in his official capacity.

hereafter refer to the allegations against Ward as though they were against the Department.

The substance of the complaint is the allegation that defendants Roge and Campisi discriminated against plaintiff on the basis of gender in the terms and conditions of her employment in violation of rights secured by the Fourteenth Amendment, and that their individual actions violated rights protected by the First, Fourth, Fifth and Fourteenth Amendments. In addition the complaint alleges certain pendant state law claims, namely that defendants' actions violated the provisions of New York State Executive Law, Section 297 *et seq.* ("§ 297"), and a claim of defamation.

Pursuant to Fed.R.Civ.P. 56 defendants move for summary judgment on all claims. With respect to the state law claims, defendants contend that the § 297 claim is barred for failure to file a notice of claim, and that the defamation claim is time-barred by the applicable state statute of limitations. Since plaintiff conceded at oral argument that these state claims are barred for these reasons, we limit the remainder of our discussion to her federal claims. For the reasons that follow defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

In June 1983 plaintiff was assigned to work at Manhattan Traffic, a previously all male division of the Department. The defendant Roge was then the Commanding Officer of that Division. Plaintiff alleges that immediately after her assignment defendant Roge "began a campaign of harassment" against her because of her gender. Compl. ¶ 21. Specifically plaintiff asserts that Roge removed her from choice assignments in violation of seniority rules, punished her for tardiness in a manner which was more severe than the treatment given male officers, and on three occasions ordered her to work overtime when such assignments were usually filled by volunteers. Plaintiff offers the testimony of five other female officers to support these claims of disparate treatment motivated by gender-animus. Although no such officer testifies to direct knowledge of derogatory statements made by Roge against women, their testimony does suggest that Roge would not permit women to work together, favored men in duty assignments, and penalized women for behavior for which men were not similarly disciplined. *See e.g.,* Jacobs at 13, 16; Carter at 14; Lopez at 10.

The complaint also alleges that defendant Roge unjustifiably targeted plaintiff for surveillance by internal police investigators for alleged drug use and caused her to have her urine screened for the presence of drugs. For purposes of this claim, the relevant facts are as follows.

Sometime in October 1985, Lieutenant Moakley ("Moakley") of the Field Investigation Affairs Unit began a "self-generated" investigation of plaintiff for suspected drug use. Moakley testified that he initiated this investigation after being informed by Lieutenant Pollack ("Pollack"), an Integrity Control Officer, that he and other supervisors believed plaintiff was using drugs. Moakley, at 20, 21. Pollack testified that he did not, personally, believe plaintiff was using drugs. Pollack, at 63. On November 19 Moakley received a telephone call from Roge in which Roge conveyed his belief that plaintiff was using drugs. Moakley, at 21. Pursuant to this conversation Moakley closed the self-generated investigation and opened an official Internal Affairs Division investigation of plaintiff. *Id.* at 22.

Department regulations in effect at the time of these events specify that "[i]n all cases in which the belief [of drug use by an officer] is based upon observations of the officer, two (2) supervisors are required to observe the suspected drug abuser". Pl. Exh. I. Roge testified that he had no personal basis to believe plaintiff was using drugs, but that he acted on the information provided by Pollack. Roge at 66, 120. Pollack testified that it was Roge who initiated to him the possibility of plain-

tiff's being a drug-user. Pollack, at 34, 38.[2]

Plaintiff was surveilled by investigators over the course of the next sixteen months. These observations occurred on numerous occasions, each lasting from five minutes to over five hours. At no time did the investigators uncover evidence of drug use, and on March 13, 1986 the investigation was terminated and the allegations of drug use classified by Moakley as "unsubstantiated". In July 1986 Moakley opened another investigation to monitor plaintiff. Moakley testified that the determination to initiate this third investigation was his alone, as it was his standard practice in all drug allegation cases to order follow-up investigations in order to take account of the possibility that the suspect had been aware of being watched in the previous investigation. Moakley, at 50, 59–60; Def. 3(g), at ¶¶ 21–23. This investigation also yielded no proof of drug use, and it was closed in February 1987.

The complaint alleges that the daily surveillance caused by these investigations caused plaintiff to become increasingly anxious and despondent about her job as a police officer, precipitating the onset of psychological symptoms of depression and the development of an ulcer, colitis and gastroenteritis. Compl. ¶¶ 27, 28. Sometime prior to September 1986 plaintiff sought medical treatment for these ailments and was placed on prescription medication.

On September 17, 1986 plaintiff informed the desk sergeant, Sgt. Flynn ("Flynn"), that she was ill and requested permission to stay in the station house rather than report to her field post issuing traffic summonses, or to take a sick day. After consulting with Roge, Flynn informed plaintiff that she must either take her field post or report sick. Plaintiff went on patrol. Thereafter Roge phoned Moakley and conveyed the suspicion that plaintiff may be under the influence of drugs. Moakley, at 69; Roge, at 148, 152. Moakley directed

that plaintiff should be called in from the field and proceeded to interview her. In response to the inquiry of plaintiff's counsel as to what was the basis of Roge's suspicion of plaintiff's drug use on this occasion, Roge testified that Flynn had informed him that he suspected that plaintiff "may be under the influence or using drugs". Roge, at 148. Flynn's deposition testimony, however, denies ever having conveyed to Roge a suspicion that plaintiff used drugs. Rather, Flynn testified that it was Roge who informed him "that Lt. Moakley would be in to escort Officer Carrillo [plaintiff] for an assessment test, possible use of controlled substance". Flynn, at 12, 19.

After meeting with Moakley and after informing him that she was on prescription medication for stomach ailments, plaintiff agreed to accompany Moakley to the Health Services Division ("Health Services") for a medical evaluation. Plaintiff was then examined by Dr. Fried. Despite the fact that plaintiff informed Dr. Fried that she was on prescription medicine and gave him the phone number of her personal physician, he recommended a drug screening test of plaintiff's urine. Dr. Thomas, the Department's Chief Surgeon, approved this recommendation, and plaintiff was ordered to render a urine specimen. The drug test of plaintiff's urine was negative.

In 1986 there were Department regulations which governed the administration of urine-analysis drug tests (hereinafter "Dole tests"). These regulations established that there must be "a reasonable basis to believe that an individual member of the service is wrongfully using drugs" prior to administering a Dole test. More specifically, Interim Order No. 13 provides that an investigating supervisor must confer with an attorney assigned to the Department Advocate's office, and in most circumstances with his immediate supervisor, prior to ordering a Dole test. Pl.Exh. I. Interim Order No. 13–1, promulgated in 1985, amends Interim Order No. 13 and permits

---

**2.** There is some testimony that a female officer, Officer Prince, was the source of the allegation that plaintiff may be using drugs, however Officer Prince's deposition testimony categorically denies having ever informed any member of Department of suspecting plaintiff of drug use. *See* Campisi at 11, 19–20; Prince at 32.

that a medical doctor employed by the department may order a Dole test without securing prior approval of the Department Advocate, after conferring with the Supervising Chief Surgeon. *Id.* Plaintiff asserts that in the circumstances of this case, namely her being escorted to Health Services by an Internal Affairs Division lieutenant, there is a question of fact as to whether or not Dr. Fried, as opposed to Roge, ordered the drug test, and accordingly as to whether or not defendants had complied with department regulations.

In October 1986 Roge was transferred, and Campisi assumed his duties. On November 7, plaintiff's gun was taken away from her and on November 10 she was placed on restricted duty. Def.3(g), at ¶ 24. In April 1987 plaintiff was restored to active duty and permanently assigned to the Automobile Investigation Unit, where her superior officer was Sgt. Eubanks. On August 18, Sgt. Eubanks gave plaintiff a "Below Standards" performance evaluation, asserting that she showed poor motivation in her work; Campisi concurred in this evaluation. Commencing in September 1987 plaintiff was absent from work, taking sick leave and maternity leave through May 1, 1988.[3]

Upon her return in May 1988, plaintiff learned of her August 1987 "below standards" evaluation and appealed this determination to Campisi. After Campisi consulted with Health Services and was informed by Dr. Kuhn that plaintiff's health conditions did not justify her inability to perform her assigned duties, Campisi affirmed Sgt. Eubanks' report. Plaintiff's appeal of this determination was also denied by the Personnel Officer of the Traffic Division.

On August 8, 1988, after plaintiff appeared dizzy she was sent to Health Services for a medical evaluation. The following day, after conferring with plaintiff's mother and Dr. Reich, Campisi again sent plaintiff for an examination. On that day, Dr.

Petit asked plaintiff to submit to a Dole test. After consulting with counsel, plaintiff refused so to submit.

During Campisi's tenure as her commanding officer, plaintiff complained to him that male police officers under his command told offensive sex-related jokes, that her inter-departmental mail was being interfered with, and that a phallic symbol had been displayed to her by a male officer. Campisi responded to each complaint, specifically: he instructed all officers under his command that sexually offensive behavior was improper and would not be tolerated; he assigned a lieutenant to investigate the interference with plaintiff's mail; and he ordered a search of the desk of the officer suspected of displaying the phallic symbol. In addition, after plaintiff complained to the Internal Affairs Division of the existence of sexually explicit posters at Manhattan Traffic, Campisi had the posters removed and instructed all officers that such displays violated Department regulations.

On December 12, 1988 plaintiff retired from the Department on ordinary disability.

On the basis of these facts, the complaint alleges: 1) that defendant Roge's actions, including targeting plaintiff—without a reasonable basis in fact—for investigation and causing plaintiff to have her urine screened for the presence of drugs, discriminated against her on the basis of gender in the terms and conditions of her employment in violation of her Fourteenth Amendment rights; 2) that defendant Campisi continued this gender harassment and discrimination by failing to take steps to discontinue the drug surveillance even though he knew that there was no basis in fact therefor, and by knowingly permitting the gender-hostile work environment to persist, in violation of plaintiff's Fourteenth Amendment rights; 3) that defendants' prolonged surveillance of plaintiff and their ordering her to submit to a uri-

---

**3.** Plaintiff commenced the instant action on November 7, 1987. By stipulation dated May 16, 1989, the parties agreed to permit plaintiff to supplement the complaint to add Campisi as a

defendant, and to include the allegations relating to events which occurred post November 1987 and prior to May 1989.

nalysis drug test violated her Fourth Amendment right to be free from "unreasonable searches and seizures"; 4) that defendants' actions so unreasonably interfered with her ability to perform her job, that they resulted in her constructive discharge, depriving her of her liberty interest in employment without due process of law in violation of rights protected by the Fourteenth Amendment; and 5) that the official Departmental policy to permit investigations to continue without standards for when they are to be terminated was a proximate cause of the above described violations of plaintiff's constitutional rights, making the city liable to plaintiff.

## DISCUSSION

Defendants assert that plaintiff cannot maintain her Fourth Amendment claims or her claim of deprivation of liberty because they are immune from suit under the doctrine of qualified immunity, that plaintiff's Fourteenth Amendment equal protection claims must be dismissed because on the basis of the undisputed facts plaintiff has failed to allege sufficient evidence to support her allegations of gender discrimination, and that the claims against the Department must be dismissed for plaintiff can not establish that a Departmental custom, policy or practice caused a deprivation of her civil rights. We address each of the contentions in turn.

### I

■ The doctrine of qualified immunity protects "government officials performing discretionary functions ... from liability for civil damages in so far as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known". *Harlow v. Fitzgerald* (1982) 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396; *see Anderson v. Creighton* (1986) 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 ("[the] contours of the right [alleged to have been violated] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right".)

With respect to the constitutional claims arising out of the drug-testing of plaintiff's urine and the surveillance, defendants assert that neither Dole tests nor continuous surveillance were recognized as "searches" or "seizures" within the ambit of constitutional protection in 1986, or even in 1988, and that consequently these claims are barred by the defense of qualified immunity. Plaintiff responds that the existence in 1986 of Department regulations which mandated that there must be a reasonable basis in fact prior to ordering either a urinanalysis or surveillance, as well as some caselaw recognizing urine tests as "searches", demonstrates that the status of these procedures as within the meaning of the Fourth Amendment was "clearly established" as early as 1986.

■ On a motion for summary judgment, it is within the jurisdiction of the court to determine whether the law plaintiff alleges defendants to have violated was clearly established at the time of the alleged violation. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. In *Molinelli v. Tucker*, (2nd Cir.1990) 901 F.2d 13, the Second Circuit examined the precise question of whether or not in October 1986 the Fourth Amendment status of urine testing was sufficiently settled such that a defense of qualified immunity was not available, and determined that it was not. Specifically, the *Molinelli* court stated:

[I]t is clear from this conflict of opinion, especially the decisions within this Circuit, that there was no unequivocal holding in 1986, or even until *Skinner* in 1989, that urinalysis is a fourth amendment search ... In sum, we find that the fourth amendment status of urine testing of public employees was not "clearly established" in October 1986 ...

*Id.* at 16; *see Skinner v. Railway Labor Executives Ass'n* (1989) 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639. As the drug testing of plaintiff's urine occurred on September 17, 1986, less than a month earlier than the tests at issue in *Molinelli*, we feel constrained to adopt that court's analysis as our own.

The existence of Department regulations which required a reasonable basis in fact prior to administering a Dole test to an officer, and the circumstance that defendants' actions in the instant case may have violated these regulations, may support plaintiff's claims that defendants subjected her to disparate treatment, but they do not counter the authority that urine tests were not then clearly established as within the ambit of the Fourth Amendment. To hold otherwise would make it financially hazardous for the Department to promulgate regulations extending beyond constitutional requirements the scope of protections it offers its employees, and would therefore discourage the giving of such extended protections.

■ A similar logic applies to plaintiff's claim that defendants' continued surveillance of her over the period commencing in October 1985 and terminating in February 1987 violates rights guaranteed by the Fourth and Fourteenth Amendments. Although we find persuasive the argument that such continued surveillance may amount to an unreasonable "search and seizure" and may so unjustifiably interfere with one's ability to perform one's job as to amount to a deprivation of liberty without due process of law, we observe, and plaintiff concedes, that no court has previously identified such conduct as violative of constitutional rights. Even though this is not dispositive of our analysis of whether or not the defense of qualified immunity should prevail, *see Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039, after careful review of cases relating to the reasonableness of investigations of public employees, we can say that the instant defendants could not "fairly be said to 'know' that the law forbade [the] conduct" which they subjected plaintiff to, *see Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, and therefore we find that the defendants are properly immune

from suit on the claims arising out of the 1985–1987 surveillance.

## II

With respect to the claims of gender discrimination, defendants contend that even assuming that plaintiff was subjected to disparate treatment on the basis of gender, she is unable to establish the requisite personal involvement of the named defendants in such conduct as is necessary to recover money damages pursuant to § 1983. *See Rizzo v. Goode* (1976) 423 U.S. 362, 370–371, 96 S.Ct. 598, 46 L.Ed.2d 561; *Monell v. Dept. of Social Services* (1978) 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037 n. 58, 56 L.Ed.2d 611 (rejecting the doctrine of *respondeat superior* in § 1983 litigation).

■ In *Williams v. Smith* (2nd Cir.1986) 781 F.2d 319, this Circuit held that a defendant in a supervisory position may be said to be "personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983" if it can be shown that he, or she: a) directly participated in the infraction; b) after having learned of the violation, failed to remedy the wrong; c) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; or d) was grossly negligent in managing subordinates who caused the unlawful condition or event to occur. *Id.* at 323–324. "Since personal involvement is a question of fact we are governed by the general rule that summary judgment may be granted only if no issues of material fact exist and the defendant is entitled to judgment as a matter of law". *Id.* at 323.

■ With respect to defendant Campisi, the facts presented fail to support any claim of direct gender-discriminatory action on his behalf.[4] Furthermore the facts demonstrate, and plaintiff concedes, that every time she brought a claim of gender harass-

---

**4.** Although plaintiff contends that Campisi was wrong to concur in the "Below Standards" evaluation which Sgt. Eubanks gave her, plaintiff offers no evidence to support her claim that the negative evaluation was based on gender. Plaintiff conceded that her performance was

marginal due to health problems, Exh.L. ¶¶ 1, 6, and it is undisputed that Campisi phoned Health Services to ascertain whether or not plaintiff's medical condition justified her failure to perform her assigned tasks before formally concurring in Eubanks' report.

ment to his attention, he took action to cure it. Plaintiff contends, however, that Campisi knew, or should have known, of the existence of the gender-hostile work environment—including the surveillance of plaintiff—which existed under Captain Roge's command, and that therefore he may be found personally liable for the harm which such continued unconstitutional practices caused, even absent her having brought such practices to his attention. The only support plaintiff offers for imputing this knowledge to Campisi, however, is the fact that he was employed as a sergeant and lieutenant under Roge during the years 1983 through 1986. We find that this fact, alone, is insufficient to support a finding of supervisory liability under § 1983. *Cf. Rizzo v. Goode*, 423 U.S. at 371, 375–376, 96 S.Ct. at 606–607.

As to defendant Roge, our findings are quite different. It is beyond dispute that the conflict between his testimony and the testimony of Pollack and Flynn raises a genuine issue of material fact as to whether or not there was a reasonable basis to subject plaintiff to the investigatory treatment which she—and no known male officer—received commencing in 1985, or whether such action was directly and maliciously motivated by Roge. Similarly, given the testimony of other women officers that during Roge's tenure as Commanding Officer women were systematically excluded from preferred assignments and subjected to disciplinary actions more severe than those imposed on men, and given the uncontroverted testimony of the non-party witness Officer Jacobs that supervisors under Roge's command so routinely referred to women in gender-derogatory terms that Roge had to know or should have known of such conduct, we can not say that there is no genuine issue of material fact as to whether or not Roge had actual or constructive knowledge of gender-discriminatory policies and that he permitted such conduct to continue, or was grossly negligent in his management of subordinates who promoted such conduct. *See Meriwether v. Coughlin* (2nd Cir.1989) 879 F.2d 1037, 1048 ("supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act."); *cf. Ellison v. Brady* (9th Cir.1991) 924 F.2d 872, 879 ("[A] female plaintiff states a *prima facie* case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.") We therefore find that we can not conclude, as a matter of law, that plaintiff is unable to establish the requisite "personal involvement" of defendant Roge as is necessary to establish § 1983 liability.

Accordingly, we go on to consider whether, assuming Roge's personal involvement is proven, on the basis of the evidence before us no reasonable juror could find that Roge's actions toward plaintiff were motivated by gender-animus; we can not so find. Before us are the uncontested facts that plaintiff is a female and accordingly a member of a protected class, and that prior to August 1987 plaintiff was never given a below standards performance evaluation, as well as the uncontroverted contention that the investigation of plaintiff contributed to her ill health which eventually led to the termination of her employment with the Department. In addition there is sufficient testimonial evidence to demonstrate that there is a question of fact as to whether or not Roge had a reasonable basis to commence this investigation; and there is testimony by other officers, subordinate to defendant Roge, that his treatment of females as a class was prejudicial. Confronted with these circumstances, we find that plaintiff has established a *prima facie* case of gender discrimination, and that summary judgment for Roge on this claim is inappropriate. *See McDonnell Douglas Corp. v. Green* (1972) 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (facts necessary to establish *prima facie* case of discrimination will vary in each case); *Montana v. First Federal Savings and Loan Assoc.* (2nd Cir. 1989) 869 F.2d 100, 104 (to establish *prima facie* case of discrimination, plaintiff need

only demonstrate: (1) that she is a member of a protected group; (2) that her job performance was satisfactory; (3) that she was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of unlawful discrimination); *Sorlucco v. New York City Police Department* (2nd Cir.1989) 888 F.2d 4, 8 (on motion for summary judgment, all evidentiary inferences must be drawn in favor of the non-moving party, and in weighing the credibility of testimonial evidence, jury may properly consider status within the police department of the officers testifying).

### III

We turn now to the question of whether or not plaintiff has asserted a § 1983 claim for which she can recover damages against the Department. Plaintiff contends that it was official Departmental policy to permit officers such as Roge, Campisi, and Moakley, to initiate and continue investigations without any reasonable basis in fact therefor and without any guidance as to when such investigations should be terminated. She asserts that as such, it was official Departmental policy to permit "unreasonable" surveillances to occur, in violation of her "constitutional right to reasonable enjoyment of her profession". Pl. Reply Mem. at 2. Assuming *arguendo* that continued investigation/surveillance can amount to a deprivation of one's constitutional rights, we nonetheless find that plaintiff can not state a cognizable claim for municipal liability on the facts before us.

■ In order to recover monetary damages pursuant to § 1983 against a municipality a plaintiff "must prove both the existence of a municipal policy or custom and that the policy or custom caused the deprivation of his constitutional rights." *Blum v. Koch* (S.D.N.Y.1989) 716 F.Supp. 754, 758; *see City of Canton, Ohio v. Harris* (1989) 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 ("a municipality can be found liable only where the municipality *itself* causes the constitutional violation at issue." (emphasis in original)); *Monell v.*

*New York City Dept. of Social Services* (1978) 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (holding that § 1983 municipal liability should not be imposed when the municipality was not itself at fault). In *Oklahoma City v. Tuttle* (1985) 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791, the Supreme Court held that in cases in which the policy of the municipality does not "in and of itself [violate] the constitutional rights" of persons, *id.* at 821, 105 S.Ct. at 2435, "proof of a single incident of unconstitutional activity is not sufficient to impose § 1983 liability". *Id.* at 824, 105 S.Ct. at 2436. Specifically, the Court concluded that a municipality may not be held liable for the mere fact that it may have hired "one 'bad apple'", *id.* at 821, 105 S.Ct. at 2435, but may only be liable where it can be shown that a policy or custom of the city caused a person to be subjected to the deprivation of constitutional rights. *Id.* at 823, 105 S.Ct. at 2436.

■ In the circumstances of the instant case, plaintiff does not, as she could not, contend that the asserted Department "policy" to permit officers such as Moakley to determine when to commence and when to terminate investigations of its employees is *per se* violative of her constitutional rights. Rather, plaintiff's argument is that the municipality should be liable for the alleged abuse of discretion exercised by Moakley (or Roge). In the absence of any allegation that the claimed abuse of the municipality's investigative policy was widespread, or that the Department policymakers had either actual or constructive knowledge of the allegedly unconstitutional use of the described "policy", we conclude that plaintiff can not demonstrate the requisite fault of the municipality as is necessary to recover § 1983 damages against it. *Cf. City of St. Louis v. Praprotnik* (1988) 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (for a subordinate's decisions to be attributable to the government entity, "the authorized policymakers [must] approve [the] decision and the basis for it ... [s]imply going along with discretionary decision made by one's subordinates ... is not a delegation to them of authority to make policy.");

*Carrero v. New York City Housing Authority* (2nd Cir.1989) 890 F.2d 569.

## CONCLUSION

Defendants' motion for summary judgment on the claim of gender discrimination asserted against Roge is denied. In all other respects, the motion is granted.

SO ORDERED.