**Jenice TORRES, Plaintiff–Appellant,**

v.

**Leonard PISANO, Individually and as Associate Director of Maintenance and Operations of the New York University Dental Center, Defendant–Appellee,**

**New York University, Stephen Heller, Individually and as Administrative Vice President for Administrative Services of New York University, Defendants–Cross–Claimants–Appellees,**

**Eugene Coe, Individually and as Facilities Manager of the New York University Dental Center, Defendant–Cross–Claimant–Cross–Defendant–Appellee.**

No. 1137, Docket 96–7939.

United States Court of Appeals, Second Circuit.

Argued March 26, 1997.

Decided June 3, 1997.

---

Ben M. Arai, Bronx, N.Y., for Plaintiff–Appellant.

Terrance J. Nolan, New York City (S. Andrew Schaffer, of counsel), for Defendants–Appellees.

Before: NEWMAN, Chief Judge, CALABRESI, Circuit Judge, and HURLEY,* District Judge.

CALABRESI, Circuit Judge.

This is a case of hostile work environment harassment, in which the plaintiff-employee

---

has established a prima facie case and has demonstrated that the defendant-employer knew of the harassment but did not act to stop it forthwith. In it, we are called upon to determine whether the employer can be held liable despite the fact that the victim specifically asked the person to whom she reported the harassment to keep the matter confidential and to refrain from taking action for the time being. The question is by no means an easy one, and its resolution will necessarily depend on the specific circumstances surrounding the harassment. In the instant case, we conclude that the undisputed evidence establishes that the employer behaved reasonably in honoring the plaintiff's request and in failing to take immediate action. We therefore affirm the district court's grant of summary judgment.

## BACKGROUND

Plaintiff Jenice Torres, a Puerto Rican woman, was employed at the New York University ("NYU") Dental Center (the "Dental Center") from 1990 to 1994 as an Administrative Secretary to Eugene Coe, the Dental Center's Facilities Manager. Of the approximately thirty employees under Coe's command at the Dental Center at that time, Torres was the only woman. Torres alleges (and many of her co-workers corroborate) that during the course of Torres' employment, Coe constantly harassed her on the basis or her sex and race. Specifically, Torres claims that Coe: 1) "habitually referred to [Torres] as a 'dumb cunt' or 'dumb spic' in the office"; 2) made insulting remarks about the size of Torres' breasts and buttocks; 3) made sexual innuendos towards Torres; 4) crudely indicated to other employees his desire to have sex with Torres; 5) frequently told Torres that she should stay home, go on welfare, and collect food stamps like the rest of the "spics"; 6) remarked to other people that when Torres called in sick she was "probably out sucking cocks to earn extra money"; 7) ridiculed Torres' pregnancy, calling her "beer belly" and suggesting that she was not smart enough to use birth control; and 8) allowed friends of his who visited him at the office to tell people that Torres "gave a blowjob to every man who came into the office," and to throw money on the table and mockingly order Torres to strip. Coe was apparently in the habit of consuming large amounts of alcohol nearly every day at lunch, which often exacerbated his abusive behavior.

Intimidated by Coe, Torres was afraid to complain to Coe's supervisors. Although she mentioned the matter to coworkers, Torres said nothing to NYU's upper management during the first three years of her employment, and she declined to file a formal harassment charge with NYU or with her union. Finally, in September 1993, Leonard Pisano, the Assistant Director of Maintenance of Academic Facilities at NYU, heard of Coe's abusive conduct from one of Torres' coworkers. Pisano called Torres in to meet with him. At that meeting, he suggested to Torres that she file a written complaint. When Torres failed to do so, Pisano reiterated that request in December 1993 or January 1994. Around that same time, Pisano was promoted to Associate Director of Academic Facilities, a position that made him Coe's direct supervisor.

On February 23, 1994, Torres put her complaints in writing, in the form of a handwritten letter that she sent to Pisano. In the letter, Torres wrote: "First of all I would like to apologize for not writing sooner as we had originally discussed. It has taken me quite a while to gather courage and strength to begin this letter." She continued: "I have never felt so intimidated by anyone until I started working for Mr. Eugene Coe." She explained that she had not complained to Coe's supervisors because she knew that they were his friends. She "thought there wasn't anyone to turn to until [she] met [Pisano]." In the letter, Torres did not recount many specific allegations of harassment. Instead, she listed the ways in which Coe mistreated numerous employees, and offered a general criticism of Coe as a man and a boss. At the close of the letter, Torres explained that "[t]here is so much more, but it will take some time" to explain. She added, "Len, I hope and ask you to please keep this confidential until we both speak about this matter."

Three days later, at Pisano's request, Torres sent Pisano a second letter. This letter recounted ten episodes of harassment, such as Coe's remarking to Torres (whom he knew was a married, extremely religious woman) that "[b]lack men are known for their big penis [sic] and white men are know[n] to have it small, but it doesn't matter the size it's how you use it." The rest of the letter again accused Coe of playing favorites among employees and otherwise misusing his authority.

Pisano met with Torres to discuss the situation in March 1994. At that time, Torres again, in her own words, "told him to keep this confidential." Relying on that request, Pisano did nothing until late June 1994, when he called Torres in to meet with Stephen Heller, NYU's Assistant Vice President for Administrative Services. After hearing Torres' story, Heller referred her to a counselor to help her cope with the harassment. Later that month, while Coe was on vacation, Heller and Pisano met with Torres to inform her that she would be receiving a transfer to Pisano's office effective before Coe's return. Torres never worked with Coe again.

Shortly thereafter, Torres filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). In late August 1994, both Pisano and Heller separately asked Torres to drop her EEOC charge. She declined to do so.

In August 1994, Heller confronted Coe about his behavior and commenced an investigation, which culminated in Coe's termination on September 1, 1994. The following month, Torres was transferred, on her own request, to a position as a departmental secretary at the NYU Medical Center. She received a $6,500 raise in her annual salary.

In early March 1995, Torres received a right-to-sue letter from the EEOC. Three months later, she brought this suit against Coe, Pisano, Heller, and NYU, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, the New York State Human Rights Law, N.Y.EXEC.LAW §§ 290 *et seq.*, and the New York City Human Rights Law, N.Y.C. ADMIN. CODE §§ 8–101 *et seq.*[1] The complaint also set forth various claims for relief under the common law of torts.

On January 17, 1996, relying on this court's holding in *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir.1995), that, despite the statute's language to the contrary, individuals cannot be held liable under Title VII, Judge Stanton granted summary judgment and judgment on the pleadings dismissing Torres' Title VII and Title IX claims against Pisano, Heller, and Coe in their individual capacities. *See Torres v. New York Univ.*, No. 95 Civ. 4106, 1996 WL 15691 (S.D.N.Y. Jan.17, 1996). Judge Stanton also elected to dismiss the pendant state law claims against the individual defendants.

Judge Stanton's January 17 ruling left NYU as the only remaining defendant. On July 15, 1996, Judge Stanton granted NYU's motion for summary judgment on all counts, concluding that NYU could not be held liable for Coe's harassment, that there was no evidence that NYU retaliated against Torres for filing charges with the EEOC, and that Torres' common law negligence claim was barred by New York's workers compensation statute. *See Torres v. New York Univ.*, No. 95 Civ. 4106, 1996 WL 393565 (S.D.N.Y. July 15, 1996).

This appeal followed.[2]

---

**1.** We have repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII. *See, e.g., Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714–15 & n. 6 (2d Cir. 1996). It has been suggested that "the 'legislative history' of the [New York City Human Rights Law] makes clear that it is to be even more liberally construed than the federal and state anti-discrimination laws." *Burger v. Litton Indus., Inc.*, No. 91–Civ. 0918, 1996 WL 421449, at *19 (S.D.N.Y. Apr.25, 1996), *report adopted*, No. 91 Civ. 0918, 1996 WL 609421 (S.D.N.Y. Oct.22,

1996). It has also been suggested that "[i]n terms of imputing liability to the employer, the [New York State Human Rights Law] imposes a stricter standard than Title VII." *Bush v. Raymond Corp.*, 954 F.Supp. 490, 496 n. 3 (N.D.N.Y. 1997). But we need not consider those issues here, as Torres has not challenged the district court's dismissal of her state and city human rights claims on appeal.

**2.** While Torres' notice of appeal initially indicated that she was appealing from both the January

**630**

## DISCUSSION

### I

Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review a grant of summary judgment *de novo,* drawing all factual inferences and resolving all ambiguities in favor of the nonmoving party. *See Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.1997). Applying this standard, we find that NYU cannot be held liable for Coe's harassment, and for that reason we affirm the judgment of the district court.

### II

Title VII prohibits discrimination on the basis of race and sex with respect to the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1).[3] It is now accepted that this language "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment" and to forbid sexual harassment in the workplace. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal quotation marks omit-

17, 1996 and the July 15, 1996 orders, her brief on appeal challenges only the district court's grant of summary judgment to NYU.

**3.** Title IX provides that "[n]o person in the United States shall, on the basis of sex, ... be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). We have held that Title VII principles apply in interpreting Title IX. *See Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 248 (2d Cir.1995) ("In reviewing claims of discrimination brought under Title IX by employees, whether for sexual harassment or retaliation, courts have generally adopted the same legal standards that are applied to such claims under Title VII."); *see also Preston v. Com. of Virginia ex rel. New River Community College,* 31 F.3d 203, 207 (4th Cir.1994) ("We agree that Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX."). Accordingly, what is said below with respect to Title VII applies to Torres' Title IX claims as well.

While this court has previously indicated in *dicta* that "Title IX has been construed to prohib-

ted). A plaintiff seeking relief for sexual harassment may proceed under two theories: 1) *quid pro quo* harassment; and 2) hostile work environment. *See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). The same is true for racial harassment. *See Harrison v. Metropolitan Gov't. of Nashville and Davidson County,* 80 F.3d 1107, 1118 (6th Cir.) ("[T]he elements and burden of proof that a Title VII plaintiff must meet are the same for racially charged harassment as for sexually charged harassment."), *cert. denied,* —— U.S. ——, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996); *cf. Snell v. Suffolk County,* 782 F.2d 1094, 1102–3 (2d Cir.1986) (applying sexual harassment case law in a Title VII racial harassment case). In the instant case, Torres alleges that Coe's conduct created a racially and sexually hostile work environment.

### III

As an initial matter, NYU claims that Torres' allegations of harassment do not, as a matter of law, suffice to establish the existence of a hostile work environment. We emphatically reject this contention.

A hostile work environment exists "[w]hen the workplace is permeated with dis-

it gender discrimination against both students enrolled in federally supported educational programs and employees involved in such programs" and that any "aggrieved individual has an implied right of action for injunctive relief or monetary damages," *Murray,* 57 F.3d at 248 (citation omitted), it should be noted that the only circuit to have decided the question has concluded that an employee of an educational institution has no private right of action for employment discrimination under Title IX. *See Lakoski v. James,* 66 F.3d 751, 754 (5th Cir.1995) ("Given the availability of a private remedy under Title VII for aggrieved employees, we are unwilling to [find] ... an implied private right of action for damages under Title IX for employment discrimination. Doing so would disrupt a carefully balanced remedial scheme for redressing employment discrimination by [university] employers ...."), *cert. denied,* —— U.S. ——, 117 S.Ct. 357, 136 L.Ed.2d 249 (1996); *see also Cooper v. Gustavus Adolphus College,* 957 F.Supp. 191, 193 (D.Minn.1997). We need not reach that question here, as we conclude below that, even if she does have a private right of action under Title IX, Torres cannot establish NYU's liability for Coe's harassment.

criminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370 (citation and internal quotation marks omitted). Conduct that is "merely offensive" and "not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.*

NYU argues that Torres has done no more than allege a handful of incidents of inappropriate behavior that, as a matter of law, were not so pervasive as to meet this objective test. *See Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief."); *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir.1989) ("The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."). While we agree with the principle that isolated,[4] minor episodes of harassment do not merit relief under Title VII, we disagree with its applicability in this case.

In her deposition testimony, Torres alleged that Coe constantly harassed her—so often that she "lost count"—but that she could recall the exact dates and circumstances of only a few incidents of harassment. As such, she may find it difficult to convince a jury that pervasive harassment in fact took place, and that a reasonable employee in her shoes would have found her working environment hostile. But this court cannot say as a matter of law that Coe's alleged conduct did not suffice to create a hostile work environment. If a jury were to credit Torres' general allegations of constant abuse, which were confirmed by her coworkers, it could reasonably find pervasive harassment, even in the absence of specific details about each incident. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1456 (7th Cir.1994) ("[Plaintiff] maintains that she was subjected to almost daily comments, gestures, and innuendo of a sexu-

al nature whenever [the supervisor] was in the office, which by all accounts was at least a majority of the time. Yet because [plaintiff] is unable to recite [the supervisor's] specific comment on each occasion, [the employer] contends that we are limited to the five incidents she has detailed. But we think there is sufficient evidence in the record to corroborate [plaintiff's] charge of ongoing conduct to require a trial on that issue."); *Fernot v. Crafts Inn, Inc.*, 895 F.Supp. 668, 677 (D.Vt.1995) ("The fact that the testimony indicated that [the supervisor] was 'always' making sexual remarks and regularly leered at [the plaintiff], rather than giving specific dates, does not negate its role in establishing a work environment of sufficiently pervasive sexual harassment."). *See generally DiLaurenzio v. Atlantic Paratrans, Inc.*, 926 F.Supp. 310, 314 (E.D.N.Y.1996) (noting that the pervasiveness of harassing conduct "is the sort of issue that is often not susceptible of summary resolution").

If the allegations made by Torres are true, she will surely be able to establish that she reasonably found her working environment hostile and abusive. In fact, in light of Coe's repeated statements, which are quoted above, and which are sufficiently offensive that we decline to repeat them here, we find it patently offensive that NYU is willing to concede in its brief only "that several of these incidents as related by plaintiff, if true, were inappropriate, tasteless attempts at humor and conversation, *that could be considered not the best behavior by some people*" (emphasis added).

The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases. *See Harris*, 510 U.S. at 22, 114 S.Ct. at 370 (stating that "Title VII comes into play before the harassing conduct leads to a nervous breakdown," and noting that the "appalling conduct" alleged in prior cases should not be taken to "mark the boundary of what is actionable"). Harassed employees do not have to be Jackie Robin-

---

4. Of course, even a single episode of harassment, if severe enough, can establish a hostile work environment. *See Tomka*, 66 F.3d at 1305 ("[E]ven a single incident of sexual assault suffi- ciently alters the conditions of the victim's employment and clearly creates an abusive work environment for the purposes of Title VII liability.").

son, nobly turning the other cheek and remaining unaffected in the face of constant degradation.[5] They are held only to a standard of reasonableness. Whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment. *See id.* at 21, 114 S.Ct. at 370.

A reasonable woman[6] would find her working conditions altered and abusive when her own supervisor repeatedly referred to her as a "dumb cunt," suggested that she was in the habit of performing oral sex for money, ridiculed her pregnancy, commented on her anatomy and his desire to have sex with her, and allowed friends of his who visited him at the office to make crude sexual remarks about her.[7] Likewise, a reasonable Puerto Rican would find a workplace in

5. Despite having to endure continuous abuse and racial discrimination upon breaking Major League Baseball's color barrier fifty years ago, Jackie Robinson was able to compile a .297 batting average, lead the league in stolen bases, and earn the Rookie of the Year award. *See* CHARLES C. ALEXANDER, OUR GAME: AN AMERICAN BASEBALL HISTORY 202–03 (1991).

6. *See Newton v. Department of the Air Force,* 85 F.3d 595, 599 (Fed.Cir.1996) (citing and parenthetically quoting *Ellison v. Brady,* 924 F.2d 872, 880 (9th Cir.1991) ("Well-intentioned compliments by co-workers or supervisors can form the basis of a sexual harassment cause of action if a reasonable victim of the same sex as the plaintiff would consider the comments sufficiently severe or pervasive to alter a condition of employment and create an abusive working environment.")); *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995) ("Whether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics."); *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753 (3d Cir.1995) (noting that the relevant question is whether "the discrimination would have detrimentally affected a reasonable person of the same protected class in that position"); *Dey,* 28 F.3d at 1456 ("[T]he incident on the elevator ... would no doubt be even more frightening to a reasonable woman in Dey's position who, prior to that incident, had endured more than two years of verbal harassment."); *Burns v. McGregor Electronic Indus., Inc.,* 989 F.2d 959, 962 n. 3 (8th Cir.1993) ("[I]n hostile environment litigation under Title VII, the appropriate standard is that of a reasonable woman under similar circumstances."); *Yates v. Avco Corp.,* 819 F.2d 630, 637 (6th Cir.1987) ("In a sexual harassment case involving a male supervisor's harassment of a female subordinate, it seems only reasonable that the person standing in the shoes of the employee should be 'the reasonable woman' since the plaintiff in this type of case is required to be a member of a protected class and is by definition female."); *Carrillo v. Ward,* 770 F.Supp. 815, 822 (S.D.N.Y.1991) (citing *Ellison,* 924 F.2d at 879); *cf. Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1179 (2d Cir. 1996) (noting that "the public has frequently been reminded, by courts and commentators, that the subjective sensibilities of an alleged victim may be a relevant consideration in determin-

ing whether conduct by a supervisor or a co-worker is legally sanctionable") (citing *Ellison,* 924 F.2d at 878–79). *But see DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 594 (5th Cir.) ("The test is an objective one, *not* a standard of offense to a 'reasonable woman.' "), *cert. denied,* —— U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995). The court in *DeAngelis* based its decision—that the objective test does not include consideration of the perspective of a "reasonable woman"—on the Supreme Court's use of the "reasonable person" test in *Harris. See DeAngelis,* 51 F.3d at 594. But given that the Supreme Court refused to consider the issue in *Harris,* we do not see how that decision can be taken to have foreclosed the use of a more contextualized objective standard. *See Harris,* 510 U.S. at 22–23, 114 S.Ct. at 370–71 (noting that the Court need not address the EEOC's proposed harassment regulations) (citing 58 Fed.Reg. 51266, 51269 (1993) ("The 'reasonable person' standard includes consideration of the perspective of persons of the alleged victim's race, color, religion, gender, national origin, age, or disability.")); *see also Crowe v. Wiltel Communications Sys.,* 103 F.3d 897, 900 (9th Cir.1996) (explaining that there is no conflict between a standard that takes into account "the perspective of a reasonable person[ ] ... with the same fundamental characteristics as plaintiff" and the Supreme Court's decision in *Harris* ).

In light of *Harris,* several courts have found that a district court does not err in instructing the jury as to a "reasonable person" standard, rather than a "reasonable woman" standard. *See Watkins v. Bowden,* 105 F.3d 1344, 1356 & n. 22 (11th Cir.1997); *Gillming v. Simmons Indus.,* 91 F.3d 1168, 1172 (8th Cir.1996). We do not consider that issue here. We do note, however, that the Ninth Circuit has found that a district court complies with *Harris* by instructing the jury to use the standard of "a reasonable person[ ] ... with the same fundamental characteristics as plaintiff." *See Crowe,* 103 F.3d at 900.

7. It is not only "a woman of Victorian delicacy—a woman mysteriously aloof from contemporary American popular culture in all its sex-saturated vulgarity," *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 431 (7th Cir.1995) (Posner, *C.J.*), who would take substantial offense at Coe's com-

which her boss repeatedly called her a "dumb spic" and told her that she should stay home, go on welfare, and collect food stamps like the rest of the "spics" to be hostile. Torres has therefore established a strong prima facie case of sexual harassment.

The fact that many of Coe's statements were not made in Torres' presence is, in this case, of no matter; an employee who knows that her boss is saying things of this sort behind her back may reasonably find her working environment hostile. *Cf. Kotcher,* 957 F.2d at 61, 63 (finding that a supervisor who often pretended to masturbate and ejaculate at an employee behind her back had created a hostile work environment); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir.1997) (emphasizing "that sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII"); *Reynolds v. Atlantic City Convention Ctr. Auth.,* Civ. A. No. 88–4232, 1990 WL 267417, at *4 (D.N.J. May 26, 1990) (granting an employer's motion for summary judgment in part because there was no evidence that the plaintiffs knew what was said about them behind their backs), *aff'd,* 925 F.2d 419 (3d Cir.1991).

## IV

Despite the existence of a jury question as to whether Coe's conduct created a hostile work environment, we affirm the district court's conclusion that, as a matter of law, NYU may not be held liable for that conduct.

■ Whereas liability for *quid pro quo* harassment is always imputed to the employer, a plaintiff seeking to recover from an employer for hostile work environment must demonstrate some specific basis to hold the employer liable for the conduct of its employees. *See Karibian v. Columbia Univ.,* 14 F.3d 773, 779 (2d Cir.1994). The Supreme Court has declined to announce a definitive rule on employer liability in hostile work environment cases. *See Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. Instead, the Court has instructed us to look to common law principles of agency. *See id.*

Relying on the imperfect analogy to agency law, and specifically on the Restatement of Agency, courts have had difficulty establishing coherent rules in this area. While cautioning that "[a] rule of employer liability deriving from traditional agency principles cannot be reduced to a universal, pat formula," we have summarized the law in this circuit thusly:

> [A]n employer is liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship. In contrast, where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, the situation will generally be indistinguishable from cases in which the harassment is perpetrated by the plaintiff's co-workers; consequently, ... the employer will not be liable unless "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."

*Kotcher,* 957 F.2d at 63.

---

ments. And in any event, judges should be careful to remember that American popular culture can, on occasion, be highly sexist and offensive. What *is,* is not always what is right, and reasonable people can take justifiable offense at comments that the vulgar among us, even if they are a majority, would consider acceptable. *See Reed,* 95 F.3d at 1179 ("It cannot be denied that we live in a time of significant cultural change, in which varieties of coarse conduct once taken for granted in the American workplace appear to be subject to punishment under the law."); *King v. Hillen,* 21 F.3d 1572, 1582 (Fed.Cir.1994) ("[N]o principled argument supports the view that sex-based offensive behavior in the workplace is immune from remedy simply because it may be culturally tolerated outside of the workplace. The purpose of Title VII is not to import into the workplace the prejudices of the community, but through law to liberate the workplace from the demeaning influence of discrimination, and thereby to implement the goals of human dignity and economic equality in employment."); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1486 (3d Cir.1990) (" '[W]hile Title VII does not require that an employer fire all "Archie Bunkers" in its employ, the law does require that an employer take prompt action to prevent such bigots from expressing their opinion in a way that abuses or offends their co-workers.' ") (quoting *Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 350 (6th Cir.1988)).

*Karibian,* 14 F.3d at 780 (some citations omitted). We have also noted that "[a]t some point ... the actions of a supervisor at a sufficiently high level in the hierarchy would necessarily be imputed to the company." *Kotcher,* 957 F.2d at 64.

■ To recap, an employer will be held liable for the harassment perpetrated by one of its supervisors if:

a) the supervisor was at a sufficiently high level in the company, or

b) the supervisor used his [8] actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship, or

c) the employer provided no reasonable avenue for complaint, or

d) the employer knew (or should have known) [9] of the harassment but unreasonably failed to stop it.[10]

## A. Sufficiently High Level in the Hierarchy

■ While it is not clear where the line that we mentioned in *Kotcher*—above which a supervisor is at a sufficiently high level in the management hierarchy of the company for his actions to be imputed automatically to the employer—is to be drawn,[11] we find that Coe's position did not cross it. As the highest ranking official at the remote Dental Center, Coe occupied no higher a position in the employer's hierarchy than did the supervisor whose actions we did not impute to the employer in *Kotcher.* *See Kotcher,* 957 F.2d at 64 (noting that the supervisor was the highest ranking company official at the employment site, but did not occupy a position in the upper echelon's of the company's management).[12] As such, Coe was merely a

---

**8.** We use the male pronoun since the context of this case, and most harassment cases, is that of a male supervisor and a female victim. We do not doubt that in other contexts, the genders can be different.

**9.** An employer can be held liable if it had constructive notice of the harassment, that is, if officials sufficiently high in the management hierarchy should have gained knowledge of it through the exercise of reasonable care. *See, e.g., Murray,* 57 F.3d at 249–50; *Nichols v. Frank,* 42 F.3d 503, 508 (9th Cir.1994) ("The proper analysis for employer liability in hostile environment cases is what management-level employees knew or should have known....").

**10.** In a thorough discussion of employer liability under the Restatement of Agency, the Tenth Circuit has recently noted that an employer could also conceivably be held liable for a supervisor's harassment under section 219(1) of the Restatement, which provides that "[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment." RESTATEMENT (SECOND) AGENCY § 219(1) (1958) [hereinafter RESTATEMENT]. As the Tenth Circuit noted, however, liability will rarely attach under this provision because "sexual harassment simply is not within the job description of any supervisor or any other worker in any reputable business," *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437, 1444 (10th Cir.1997) (internal quotation marks omitted). *But see Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 182–84 (6th Cir.1992) (noting that, in the Sixth Circuit, a supervisor who has the authority to hire or fire the victim of harassment acts within the scope of his employment whenever the harassment takes place at the office during working hours and is foreseeable).

**11.** It appears that a supervisor may cross that line in two different ways. First, the official may be so high-ranking that the law will consider his acts to be the employer's acts. *See Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1422 (7th Cir.1986) (explaining that "[s]ince the acts of a corporation are acts of human beings, to say that the 'corporation' has committed some wrong (rather than just that it is liable under the doctrine of respondeat superior for an employee's wrong) simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act."). Second, the official may be so high-ranking that the law will conclusively presume that the employer's upper management had constructive notice of the harassment. *See Kotcher,* 957 F.2d at 64. In the latter situation, the employer will be held liable only if it did not act reasonably to stop the harassment as soon as it had constructive notice. *See infra* Part IV.D.2. It has been suggested that knowledge should be imputed to the employer whenever the harassment was committed by a supervisor. *See, e.g.,* Glen Allen Staszewski, Note, *Using Agency Principles in Finding Employer Liability for a Supervisor's Hostile Work Environment Sexual Harassment,* 48 VAND.L.REV. 1057, 1081–82 (1995). But we rejected that position in *Kotcher.*

**12.** In fact, *Kotcher* indicates that the fact that the harasser was the highest ranking official at a remote location cuts *against* automatically imputing his actions to the employer, since other members of the corporate hierarchy would be less likely to discover the harassment. *See Kotcher,* 957 F.2d at 64 ("[T]he district court could reasonably have found that the company,

"Low-level supervisor" whose actions cannot automatically be imputed to his employer.

*B. Use of Authority or the Agency Relationship*

Although Coe was Torres's supervisor, there is no evidence that he used his authority to further the harassment or that he was aided in accomplishing the harassment by the existence of the agency relationship. It is true that, "[i]n a sense, a supervisor is always aided in accomplishing the tort by the existence of the agency because his responsibilities provide proximity to, and regular contact with, the victim." *Gary v. Long*, 59 F.3d 1391, 1397 (D.C.Cir.) (internal quotation marks omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995). But that proves too much, as it would allow the exception to swallow the rule. *See id.* It is likewise the case that the supervisor is always aided by the employment relationship because the employee will fear the repercussions that might result from her complaining or resisting. But this exception too, if applied in the absence of specific evidence that the supervisor used his authority to place the employee in a position in which she felt that she could not complain without facing adverse consequences, would swallow the rule and negate our holding in *Kotcher*.[13]

Thus, in order to establish liability on the theory that the supervisor exploited the agency relationship in committing the harassment, a plaintiff "must allege facts which establish a nexus between the supervisory authority" and the harassment. *Tomka*, 66 F.3d at 1306. While this is not an onerous

requirement, we conclude that Torres has not met it. Cases in which it has been held that the supervisor was aided in the harassment by the existence of the agency relationship have universally involved a more direct use of authority than Torres has pointed to in this case. *See, e.g., id.* at 1306–07 (supervisor convened business dinner and implied that employees were required to attend; supervisor then fostered alcohol consumption at the dinner, which led to sexual assault); *Karibian*, 14 F.3d at 776 (supervisor told plaintiff that she "owed him" for all that he had done for her as her supervisor, and varied "her raises, hours, autonomy and flexibility" according to her responsiveness to his sexual advances); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1352–53 (4th Cir.1995) ("[Plaintiff] specifically testified that [her supervisor] relied upon the authority vested in him by [the employer] to coerce her to comply with his demands. [The supervisor] assertedly told [plaintiff] that if she failed to submit to him she would lose her job, and [plaintiff] testified that she knew that if she had reported [the supervisor's] conduct to anyone she would have been fired."); *DiLaurenzio*, 926 F.Supp. at 315–16 (supervisor ordered employees to call plaintiff at her home to harass her on days when she was sick; supervisor also threatened to retaliate against any employee who complained). The best argument that Torres can muster is that it was only because he was the highest ranking official at the Dental Center that Coe could come to work while intoxicated, and that, in that sense, Coe's position as supervisor facilitated the harassment. This theory is too attenuated to attach liability.[14]

---

whose main office was in Rochester, did not have constructive notice of [the supervisor's] behavior in Oswego.").

**13.** *But see* Staszewski, *supra*, at 1094 (arguing that "[i]f the harasser is acting in a supervisory capacity when he creates a hostile work environment, he will necessarily be aided by the agency relation, and liability should properly be imputed to the employer"); Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII*, 97 Harv.L.Rev. 1449, 1461 (1984) (using agency principles to argue that "[c]ourts should hold employers liable for all acts of sexual harassment committed by supervisory personnel"). Whatever the merits of the position advocated by these commentators, the Supreme Court

has rejected the suggestion that "employers are always automatically liable for sexual harassment by their supervisors." *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408.

**14.** The Tenth Circuit has articulated a means by which an employer could be held liable under the first clause of section 219(2)(d) of the Restatement, which provides for liability if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority." Restatement, *supra*, § 219(2)(d). According to the Tenth Circuit:

[T]o recover, a plaintiff must show that the employer manifested in the supervisor the authority to act on its behalf, that such manifes-

## C. Reasonable Avenue for Complaint

As the district court correctly explained, Torres cannot impute liability to NYU on the ground that it did not provide a reasonable opportunity to complain:

> Torres does not seem to dispute that NYU provided a reasonable avenue for complaint. She knew about NYU's written sexual harassment policy, but did not file a complaint with any of the people designated to receive them. She also knew that the collective bargaining agreement which governed her employment contained an anti-discrimination provision and a grievance mechanism, but she did not file a grievance.

*Torres,* 1996 WL 393565, at *2.

## D. Knowledge and Inaction

■ The law is clear that "an employer may not stand by and allow an employee to be subjected to a course of racial [and/or sexual] harassment by co-workers" or supervisors. *Snell,* 782 F.2d at 1104 (citation and internal quotation marks omitted). Rather, once an employer has knowledge of the harassment, the law imposes upon the employer a "duty to take reasonable steps to eliminate it." *Id.*

Torres first discussed the harassment with Pisano in September 1993. She sent him two letters on the subject in February 1994. Yet nothing was done about the harassment until late July 1994, when Torres was transferred to another department. In the meantime, Coe continued to harass Torres. It is pri-

marily on this basis that Torres seeks to hold NYU liable.

### 1) NYU's knowledge

As the district court noted, implicit in Torres' argument that NYU knew of the harassment and did nothing about it is the assertion that Pisano's knowledge of the harassment should be imputed to NYU. Relying on our statement that "[f]or the knowledge of a supervisor to be imputed to the company, that supervisor must be at a sufficiently high level in the hierarchy of the company" that he or she "qualif[ies] as a proxy for the company," *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996), the district court ruled in the instant case that "[t]here is no evidence in the record about Pisano's position in the·NYU management hierarchy, an issue on which Torres has the burden of proof," *Torres,* 1996 WL 393565, at * 2, and accordingly held that Pisano's knowledge could not be imputed to NYU. On this point, we disagree with the district court. We believe that there is ample evidence in the record to establish that Pisano's knowledge was attributable to NYU.

■ An official's actual or constructive knowledge of harassment will be imputed to the employer when principles of agency law so dictate. That will be the case when a) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company, *see Van Zant,* 80 F.3d at 715;[15] or b) the official is charged

---

tation resulted in harm to the plaintiff, and that the plaintiff acted or relied on the apparent authority in some way. The first element is established whenever an employer vests its supervisor with the authority to control significant aspects of the work environment. The second element is satisfied by demonstrating [that] the supervisor subjected plaintiff to sexual harassment. The third element (that plaintiff acted or relied on the apparent authority of her supervisor) is the most difficult to prove and will often hinge upon whether the employer has a formal policy against sexual harassment. When an employer lacks a formal written grievance policy, a victim of sexual harassment will reasonably perceive her only available options to be silently acquiescing in the harassment or leaving her job. In contrast, if an employer has taken

steps to remove any possible inference that a supervisor has authority to sexually harass his subordinates, the victim is likely aware the harassment is not authorized and reliance on apparent authority will be difficult to establish.

*Harrison,* 112 F.3d at 1444 (citations, brackets, and internal quotation marks omitted); *see also Bouton v. BMW of North America, Inc.,* 29 F.3d 103, 108–110 (3d Cir.1994); *Watts v. New York City Police Dep't,* 724 F.Supp. 99, 106 n. 6 (S.D.N.Y.1989). Liability cannot attach on those grounds in the instant case, however, as it is undisputed that Torres knew of NYU's harassment policy and its availability.

**15.** *Cf. Hunter,* 797 F.2d at 1422 ("Since the acts of a corporation are acts of human beings, to say that the 'corporation' has committed some wrong (rather·than just that it is liable under the

with a duty to act on the knowledge and stop the harassment, *see* RESTATEMENT (SECOND) AGENCY § 272 cmt. a (1958) [hereinafter RESTATEMENT] ("The liability of a principal because of the knowledge of the agent is based upon the existence of a duty on the part of the agent to act in light of the knowledge which he has."); or c) the official is charged with a duty to inform the company of the harassment, *see id.* at § 275 ("[T]he principal is affected by the knowledge which an agent has a duty to disclose to the principal or to another agent of the principal to the same extent as if the principal had the information.").

■■■■■ We agree with the district court that the record makes it difficult to determine whether Pisano was at a sufficiently high level in NYU's management hierarchy to qualify as a proxy for the employer. But leaving that question aside, we conclude that Pisano's knowledge can be imputed to NYU under the rule that, where the person who gained notice of the harassment was the supervisor of the harasser (*e.g.*, had the authority to hire, fire, discipline, or transfer him), knowledge will be imputed to the employer on the ground that the employer vested in the supervisor the authority and the duty to terminate the harassment. *See, e.g., Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1015–16 (8th Cir.1988); *Lamb v. Household Credit Servs.*, 956 F.Supp. 1511, 1517 (N.D.Cal. 1997); *cf. Andrade v. Mayfair Management, Inc.*, 88 F.3d 258, 262 (4th Cir.1996) (refusing to hold the employer liable in part because the harassed employee did not complain to her supervisor's (the harasser's) supervisor). The record indicates that Pisano was not Coe's supervisor at the time at which he initially learned of, but failed to act on, the

harassment. It is undisputed, however, that Pisano did become Coe's supervisor sometime in early 1994, *before* he received Torres' letters of complaint. Accordingly, NYU is responsible for Pisano's failure to act as of the date of his promotion.

Moreover, even before he became Coe's supervisor, Pisano's knowledge could potentially have been imputed to NYU on the ground that Pisano had a duty to inform the company of the harassment:

> Taken as a whole, the cases demonstrate that for purposes of Title VII, "management-level employees" [that is, employees whose knowledge can be imputed to the employer] encompass two groups of persons: first, supervisors possessing substantial authority and discretion to make decisions concerning the terms of the harasser's or harassee's[16] employment; and second, non-management employees charged with substantial responsibility for relaying employee complaints to management, particularly where management is located away from the workplace. If a co-worker has knowledge of a harassee's complaint, but that co-worker lacks authority to counsel, investigate, suspend, or fire the accused harasser, or to change the conditions of the harassee's employment, the co-worker's inaction does not spark employer liability *unless that co-worker has an official or strong de facto duty to act as a conduit to management for complaints about work conditions.*

*Lamb,* 956 F.Supp. at 1517 (emphasis added); *see also* RESTATEMENT, *supra,* at § 275.

In the instant case, while Pisano did not have supervisory authority over either Coe or Torres before his promotion in early 1994,

---

doctrine of respondeat superior for an employee's wrong) simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act."). Likewise, the failure to act on the part of a high-ranking corporate official is the corporation's failure to act.

**16.** The applicability in this circuit of the rule that the knowledge of a supervisor possessing authority over the terms of the *harassee's* employment will be imputed to the employer is uncertain. We may have suggested in *dicta* in *Van Zant* that

an employer is not necessarily liable when the plaintiff informs her immediate (low-level) supervisor of the harassment, and the supervisor fails to act. *See Van Zant,* 80 F.3d at 715–16. It is not, however, clear from the facts of that case whether the plaintiff's immediate supervisor had authority over the terms of her employment. Given the principles of agency law set out above, the correct rule would appear to be that an employer is liable for the knowledge of the harassee's supervisor if that supervisor was empowered (that is, charged with a duty) to protect the harassee from further harm.

the fact that Pisano sought out Torres and approached her about the harassment, seemingly on behalf of NYU, suggests that Pisano was "charged with substantial responsibility for relaying employee complaints to management," particularly because here "management [was] located away from the workplace." And even if Pisano was not formally charged with such a duty, Torres may reasonably have believed that he was. According to Torres, Pisano gave her the impression that she could count on him to help her resolve the situation. More importantly, NYU may have structured its management hierarchy in such a way as to suggest to Torres that Pisano was empowered to help her. Pisano himself admitted in deposition testimony that Torres might have felt that he was the correct person with whom to speak "because ... the situation with our department and how it is structured" could have led her to believe "that th[is] was an avenue to get help." If Torres could show reliance upon a reasonable impression, created by NYU, that Pisano was under a duty to help her, Pisano's knowledge could be imputed to NYU. *See* RESTATEMENT, *supra,* at § 273 ("*Except where there is reliance upon the appearance of agency,* a principal is not bound by knowledge of an agent concerning matters as to which he has only apparent authority.") (emphasis added).

We therefore conclude that, as a matter of law, NYU is responsible for Pisano's knowledge as of the date at which Pisano became Coe's supervisor, and that the record would support a finding that NYU is responsible for Pisano's knowledge even before that date. In other words, NYU knew of the harassment, but did not immediately act to stop it. This does not, however, end our inquiry.

### 2) NYU's Response

 NYU can be held liable only if Pisano did not fulfill his duty to take reasonable steps to remedy the harassment. *See Snell,* 782 F.2d at 1104. The standard is essentially a negligence one, *see* RESTATEMENT, *supra,* § 219(2)(b), "and reasonableness ... depends among other things on the gravity of the harassment alleged," *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 432 (7th Cir.1995).

On the uncontroverted facts of this case, we conclude that Pisano's failure to act cannot be termed unreasonable.

When Torres first discussed the harassment with Pisano, she asked him not to speak about the matter with anyone. Pisano explained in his deposition:

Q: Did you investigate at that time?

A: No, I didn't.

Q: Why didn't you?

A: Jenny [Torres] asked me not to do anything. She called me up and told me some things on the phone, and I said[,] ["]well, what do you want to do about it[?"] and she said[,] ["]nothing, I just wanted someone to talk about it,["] and I said[,] ["]you can call me any time you want to, if you need help let me know.["]

Pisano repeatedly suggested to Torres that she should pursue her complaint in writing. But when Torres finally sent a letter to Pisano, she closed with a heartfelt request— "Len, I hope and ask you to keep this confidential until we both speak about this matter"—and thanked Pisano for his "confidentiality" and his time. Torres never followed up that letter by authorizing Pisano to take action, at least not prior to her conversation with Heller, at which point the harassment was promptly terminated. To the contrary, Torres admits that, in a follow-up conversation with Pisano in March 1994, she again specifically "told him to keep this confidential."

Despite her request for confidentiality, Torres later testified in a deposition that she fully expected Pisano to act to rectify the situation, and that all that she meant in requesting confidentiality was that she did not want Pisano to speak freely about the matter "with people who have no business knowing what is going on." But in evaluating the reasonableness of Pisano's conduct, Torres' understanding is not determinative. What *is* relevant is what Torres said to Pisano, and Pisano's reasonable understanding of what she meant. It is undisputed that Torres, on more than one occasion, asked Pisano to keep the matter "confidential." Pisano explained his understanding of that request

when he was asked why he failed to take action:

A: Because of Jenny. She asked me not to. She asked me again, not to speak to anyone when she had written me those letters in February of [1994]. She specifically wrote in the letters, I'm afraid, please don't say anything to anyone. I felt that I was the only person she had turned to at this point regarding this problem, and to betray her trust in the matter would do harm rather than good.

We therefore have before us a situation in which an intimidated and embarrassed employee was finally able to gather the strength to complain about the harassment that she had been enduring, but specifically asked the supervisor to whom she complained to keep the matter confidential and to refrain from taking action until a later date. Does a supervisor breach his duty to remedy the harassment by honoring the employee's request? That is not a question that we can answer categorically. Its resolution will vary from case to case.

There is certainly a point at which harassment becomes so severe that a reasonable employer simply cannot stand by, even if requested to do so by a terrified employee. But that is not this case. There are, for example, no allegations here of any serious physical or psychological harm that would have occurred if the employer did not act forthwith. And the law will not presume in every case that harassed members of Title VII's protected classes do not know what is best for themselves and cannot make reasonable decisions to delay—at least for a time—pursuing harassment claims, perhaps for privacy or emotional reasons, until they are ready to do so.

Likewise, there may be cases in which a supervisor or co-worker is harassing a number of employees, and one harassed employee asks the company not to take action. In those cases, the employer's duty to the other employees would take precedence, and the company would most likely not be justified in honoring a single employee's request not to act. But that too is not this case.

What then of this case? By asking Pisano to keep the matter confidential, Torres placed him in a difficult situation. She wrote in her letter: "I thought there wasn't anyone to turn to until I met you. I finally found someone to confide in." Had Pisano ignored her request and pursued a harassment complaint—in the face of Torres' own conscious decision not to do so—he would have breached her trust. There will be cases in which an employer is forced to do that. But this is not one of them. Torres' letters to Pisano recounted only a few relatively minor incidents of harassment; they did not come close to conveying the full extent of the abuse subsequently alleged in this lawsuit. Moreover, Torres was the only victim of Coe's racial and sexual harassment. She was the only female employee in Coe's office at the Dental Center, and there is no indication in the record that any other employees were being harassed by Coe in violation of Title VII. On these facts, it must be said as a matter of law that Pisano behaved reasonably in honoring Torres' request for confidentiality and in failing to act immediately to end the harassment. Accordingly, while NYU is liable for Pisano's actions, Pisano did not breach his duty to protect Torres from further harassment.

### V

On separate occasions in August 1994, Pisano and Heller each asked Torres to drop her EEOC charge. Torres argues that these requests, which she characterizes as demands, constituted retaliation for her having complained about Coe's harassment. We reject this argument.

■ It is unlawful for an employer to retaliate against an employee for filing a charge pursuant to Title VII. *See* 42 U.S.C. § 2000e–3(a). To establish a prima facie case of unlawful retaliation, a plaintiff must show: "i) participation in a protected activity known to the defendant; ii) an employment action disadvantaging the plaintiff; and iii) a causal connection between the protected activity and the adverse employment action." *Tomka,* 66 F.3d at 1308.

■ While it is undisputed that Torres' filing of an EEOC charge constituted participation in a protected activity, Torres cannot

show that she suffered an adverse employment action. Torres claims that Pisano's and Heller's requests left her feeling "frightened" and "intimidated," but she has not shown, as she must, that she suffered "a materially adverse change in the terms and conditions of employment." *McKenney v. New York City Off–Track Betting Corp.,* 903 F.Supp. 619, 623 (S.D.N.Y.1995).

We have held that "[r]easonable defensive measures do not violate the anti-retaliation provision of Title VII, even though such steps are adverse to the charging employee and result in differential treatment," so long as they "do not affect the complainant's work, working conditions, or compensation." *United States v. New York City Transit Auth.,* 97 F.3d 672, 677 (2d Cir.1996).

It is conceivable that a demand to withdraw an EEOC charge could constitute retaliation, if it truly had so great an effect on the plaintiff as to alter the conditions of her employment in a material way. For instance, repeated and forceful demands accompanied even by veiled suggestions that failure to comply would lead to termination, discipline, unpleasant assignments or the like, might in some circumstances affect an employee's working conditions. But here Torres admits that Heller and Pisano did not repeat their requests, that she in fact refused their requests, and that she suffered no negative consequences as a result of having turned them down. As such, Torres did not experience an adverse employment action. Indeed, taken as a whole, Pisano's and Heller's reaction to Torres' complaint materially *improved* the conditions of her employment. Torres was transferred at her request and given a substantial raise. And the man who harassed her was fired.

## VI

Torres also alleges that NYU should be held liable under the common law of negligence, based on its failure to supervise Coe and to prevent the establishment of a hostile working environment. As the district court properly found, that claim is barred by New York's Workers' Compensation Law, which provides: "The right to compensation or benefits under this chapter, shall be the exclu-

sive remedy to an employee ... when such employee is injured or killed by the negligence or wrong of another in the same employ." N.Y.WORK.COMP.LAW § 29(6); *see also Burlew v. American Mut. Ins. Co.,* 63 N.Y.2d 412, 482 N.Y.S.2d 720, 722, 472 N.E.2d 682, 684 (1984) (holding that a claim of negligence against an employer is barred by workers compensation).

Workers' compensation exclusivity does not, however, preclude an employee's suit if the employer committed an intentional tort or another person committed such an intentional wrong at the employer's direction. *See Acevedo v. Consolidated Edison Co.,* 189 A.D.2d 497, 596 N.Y.S.2d 68, 70–71 (1993). But that exception is obviously not applicable to Torres' claim of *negligence. See Chrzanowski v. Lichtman,* 884 F.Supp. 751, 756 (W.D.N.Y.1995) ("Plaintiffs argue that their claims fall under the intentional tort or wrong exception. However, the claims at issue are pled in terms of negligence, not intentional wrong.... The negligence claims are clearly barred by the exclusivity provision."); *cf. Hart v. Sullivan,* 84 A.D.2d 865, 445 N.Y.S.2d 40, 41 (1981) (analyzing sexual harassment and discrimination in the workplace claims under the workers' compensation statute, and dismissing them because the lack of willfulness on the part of the corporate employer—as opposed to the harassing co-workers—necessitated the conclusion that the complaint against the employer was barred by workers' compensation), *aff'd,* 55 N.Y.2d 1011, 449 N.Y.S.2d 481, 434 N.E.2d 717 (1982).

In disputing this conclusion, Torres cites no cases. She argues instead that workers' compensation exclusivity should not bar Title VII harassment suits. Of course it shouldn't, nor could it under the Supremacy Clause. U.S. CONST. art. VI, cl. 2. But it can and does bar state common law negligence claims.

## CONCLUSION

Torres has made out a prima facie case of serious racial and sexual harassment. But she has not shown that NYU, through its agent Pisano, acted unreasonably in honoring

her request to keep the matter confidential, rather than taking immediate action to stop the harassment. Her hostile work environment claim against NYU must accordingly fail. So too must her claims of retaliation and negligence.

The district court's grant of summary judgment is therefore affirmed.