25 Cal.Rptr.3d 911 (2005)
Margie McRAE, Plaintiff and Respondent,
v.
DEPARTMENT OF CORRECTIONS, Defendant and Appellant.
Margie McRae, Plaintiff and Appellant,
v.
Bruce Wiltse et al., Defendants and Respondents.
Nos. A098073, A100745, A104701, A098330, A098910.
Court of Appeal, First District, Division One.
March 18, 2005.
Rehearing Denied April 18, 2005.
Review Granted June 29, 2005.
*914 Carter & Schear, Stephen D. Schear, Jana Carter, Oakland, Counsel for Plaintiff, Appellant, and Respondent Margie McRae.
Bill Lockyer, Attorney General of the State of California, Jacob Applesmith, Senior Assistant Attorney General, Miguel A. Neri, Fiel D. Tigno, Supervising Deputy Attorneys General, Marjorie E. Cox, Lyn Harlan, Deputy Attorneys General, Counsel for Defendant and Appellant, California Department of Corrections; Defendants and Respondents Bruce Wiltse, Joseph Bick, Richard Burkhart, and Donna Wilson.
STEIN, Acting P.J.
Dr. Margie McRae filed suit against her employer, the California Department of Corrections (the Department) and four individual defendants, seeking damages for discrimination and retaliation in violation of the California Fair Employment and Housing Act (FEHA).
The trial court granted summary judgment to the four individual defendants, and Dr. McRae appeals from an order awarding these defendants their costs. (Case Nos. A098330 & A098910.) The case proceeded to trial against the Department. The jury returned a verdict against Dr. McRae on her claims of discrimination, but awarded her $75,000 on her claim of retaliation. The Department appeals from the judgment entered on the jury's verdict, and from postjudgment orders awarding attorney fees to Dr. McRae. (Case Nos. A098073, A100745, A104701.)
*915 We reverse the judgment. Neither the law, nor the evidence, permits a finding that Dr. McRae suffered the kind of adverse employment action required for a claim of retaliation. And, even if one action taken by the Department  transferring Dr. McRae from one facility to another  might be deemed an adverse employment action, Dr. McRae did not rebut the Department's evidence that there was a legitimate, nonretaliatory reason for the transfer. We also reverse the orders awarding Dr. McRae her attorney fees. Finally, we affirm the order awarding costs to the individual defendants, and remand the matter to the trial court to award costs to the Department to the extent those costs are not duplicative of those awarded to the individual defendants.[1]

BACKGROUND
Dr. McRae, a board certified surgeon, began working for the Department in 1992, at the California Medical Facility in Vacaville (CMF). For several years there were no complaints about the quality of Dr. McRae's work. To the contrary, she regularly and uniformly received excellent performance evaluations.
In 1995, Dr. McRae applied for a position as Chief Medical Officer (CMO) at the California State Prison in Solano (Solano Prison). On April 25, 1997, after another person was appointed to that position, she filed a complaint with the Department of Fair Employment and Housing (DFEH), claiming that she was denied the appointment because of her race.[2] In Dr. McRae's view, her filing of this complaint triggered a number of retaliatory actions by the Department, three of which provided the basis for her claims of unlawful retaliation.
Dr. McRae alleged that the first retaliatory action was a June 26, 1997 letter of instruction issued by Dr. Raymond Andreasen, the CMO at CMF, following a report that Dr. McRae had left her position in the emergency room unattended. Dr. Andreasen instructed Dr. McRae to read and familiarize herself with regulations and memoranda outlining the obligation of physicians and surgeons to be at their posts during their rotations, and to notify her supervisor about any need to leave the job site or to report in late. On June 20, 1998, Dr. McRae filed a second DFEH complaint, claiming that the letter of instruction had been issued to retaliate against her for filing her first complaint.
Dr. McRae alleged that the second retaliatory action was an internal investigation related to reports that Dr. McRae had failed to follow two of Dr. Andreasen's directives, had refused to provide medical information that would have facilitated a patient's transfer to Hospice, and had delayed the administration of antibiotics to another patient without first examining him. The investigation led to a July 14, 1998 decision by Dr. Susan Steinberg, Deputy Director of Health Care Services Division, to suspend Dr. McRae for 30 *916 days. This decision was never implemented, however, because Dr. McRae was absent on nonindustrial disability leave.[3] Dr. McRae remained unaware of Dr. Steinberg's decision until after she filed her complaint.
Dr. McRae alleged that the third retaliatory action was a change in her work assignment. On July 29, 1998, Dr. McRae was informed that her disability leave would expire on August 15, and was told to report to work at Solano Prison rather than return to CMF. Dr. McRae did not report to work at Solano Prison as directed. On August 18, 1998, she filed a third DFEH complaint, asserting that her transfer from CMF to Solano Prison was retaliatory. When Dr. McRae did return to work, in March 1999, she reported to Solano Prison. She left approximately two and one-half weeks later, and instituted this action.

DISCUSSION
The parties paint two very different pictures of Dr. McRae's experience with the Department. Dr. McRae claimed that there was no valid basis for the letter of instruction or the investigation, concluding that they must have been issued to retaliate against her for filing the grievance concerning her failure to be appointed Chief Medical Officer. Dr. McRae complained that the investigation into her conduct was done by a layperson who reported to the administration. In her opinion, any investigation should have been done through peer review. She asserted that the investigation was done with the intent to discredit her and protect another physician. Dr. McRae believed that Dr. Andreasen's conduct in connection with the confrontation with the two nurses was further evidence of retaliation, which continued when the Department failed to take action against the nurses. When Dr. McRae complained, the Department again retaliated against her by transferring her to a dangerous situation at Solano Prison.
According to the Department, the letter of instruction was intended to remind Dr. McRae that her duties required her to arrive on time and ensure that she, or some other qualified person, was available to handle her duties during her absences. The investigation followed reports that Dr. McRae had been derelict in her duties, and was designed to determine if those reports were true. As the purpose of the investigation was to determine the truth of reports that Dr. McRae had failed to take actions that were part of her job responsibilities, there was no reason to subject the matter to peer review.[4] Dr. McRae was transferred to Solano Prison as a means of removing her from a situation that had become so unpleasant for her that she had *917 taken nonindustrial disability leave for nearly a year, and to make it possible to employ both Dr. McRae and the two nurses.

RETALIATION

General Legal Principles
Government Code section 12940, subdivision (h) makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (See also Lab.Code, § 1102.5, subd. (b).) In cases brought on claims of discrimination, including claims of retaliation, California applies the formula set forth in McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (the McDonnell Douglas test). Under that formula, "[t]o establish a prima facie case of retaliation, the plaintiff must show (1) he or she engaged in a protected activity; (2) the employer subjected the employee to an adverse employment action; and (3) a causal link between the protected activity and the employer's action. [Citations.]" (Akers v. County of San Diego (2002) 95 Cal.App.4th 1441, 1453, 116 Cal.Rptr.2d 602 (Akers).)
It is undisputed that the activity in question  filing complaints with the DFEH, is a protected activity.

Adverse Employment Action
The FEHA does not itself define "adverse employment action," and the countervailing concerns in this area of the law have led different courts to adopt different definitions of that term. It is recognized that "`[w]orkplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.' [Citation.] If every minor change in working conditions or trivial action were a materially adverse action then any `action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.' [Citation.]" (Thomas v. Department of Corrections (2000) 77 Cal.App.4th 507, 511, 91 Cal.Rptr.2d 770.) "On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a complaint ..., making such a complaint tantamount to a `get out of jail free' card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions." (Brooks v. City of San Mateo (9th Cir.2000) 229 F.3d 917, 928.)
The only published California cases on point have held that it is not enough for the plaintiff to show that he or she has been subjected to some form of adverse treatment. The plaintiff must show the employer's retaliatory actions had a detrimental and substantial effect on the plaintiff's employment. (Akers, supra, 95 Cal. App.4th at p. 1455, 116 Cal.Rptr.2d 602; Thomas v. Department of Corrections, supra, 77 Cal.App.4th at pp. 510-511, 91 Cal.Rptr.2d 770, and see Robinson v. City of Pittsburgh (3d Cir.1997) 120 F.3d 1286, 1300, Torres v. Pisano (2d Cir.1997) 116 F.3d 625, 640.) "A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient." (Akers, supra, at p. 1455, 116 Cal.Rptr.2d 602.) The reasoning is that "[r]equiring an employee to prove a substantial adverse *918 job effect `guards against both "judicial micromanagement of business practices" [citation] and frivolous suits over insignificant slights.' [Citation.] Absent this threshold showing, courts will be thrust into the role of personnel officers, becoming entangled in every conceivable form of employee job dissatisfaction. While the Legislature was understandably concerned with the chilling effect of employer retaliatory actions and mandated that FEHA provisions be interpreted broadly to prevent unlawful discrimination, it could not have intended to provide employees a remedy for any possible slight resulting from the filing of a discrimination complaint." (Ibid.)
Dr. McRae contends that the rule stated by these cases is too restrictive, preferring a rule adopted by some federal courts, including the Ninth Circuit. This rule, as articulated by the Ninth Circuit, incorporates language from the Equal Opportunity Employment Commission's (EEOC's) Compliance Manual, and holds that an adverse employment action is "`any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.'" (Ray v. Henderson (9th Cir.2000) 217 F.3d 1234, 1242-1243, citing EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998).) The Ninth Circuit has held that adverse employment actions might include demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees. (Ray v. Henderson, at pp. 1241-1242.) The Ninth Circuit explained, "While some actions that we consider to be adverse (such as disadvantageous transfers or changes in work schedule) do `materially affect the terms and conditions of employment,' others (such as an unfavorable reference not affecting an employee's job prospects) do not." (Id. at p. 1242.)
In our opinion, the deterrence test, as articulated by the Ninth Circuit, is overbroad. The Ninth Circuit recognizes that "non-trivial" actions should not be deemed "adverse employment actions." (Brooks v. City of San Mateo, supra, 229 F.3d at p. 928.) Nonetheless, the deterrence test could support a finding of adverse employment action in nearly any employment action or decision. An employee quite possibly and reasonably might wish to avoid the move of an office or a desk, the addition or subtraction of other employees, the addition or subtraction of responsibilities, a change in opening or closing times or the introduction of a dress code; yet we believe that none of these things, in and of themselves, should provide the basis for a claim of retaliation.
The deterrence test attempts to avoid this result, at least in part, by adding a retaliatory element to the definition of adverse employment. Under the EEOC guideline, it is not enough that the employment action would be likely to deter an employee from engaging in the protected activity; it also must be based on a retaliatory motive. (EEOC Compliance Manual, Section 8, "Retaliation," ¶ 8008 (1998); Ray v. Henderson, supra, 217 F.3d at pp. 1242-1243.) This definition causes the "causal link" prong of the prima facie test to collapse into the "adverse employment action" prong. (Id. at p. 1243, fn. 6), making it inconsistent with the McDonnell Douglas test. In addition, as will be discussed, post, the "causal link" element of the prima facie test can be satisfied by as little as showing the employment action followed the protected conduct closely in time and the employer was aware of the *919 protected conduct. (Morgan v. Regents of University of California (2000) 88 Cal. App.4th 52, 69, 105 Cal.Rptr.2d 652.) Adding a retaliatory element to the second prong of the McDonnell Douglas test, therefore, does little to prevent the litigation of frivolous claims.
We therefore align ourselves with existing California decisions, holding that an adverse employment action means an employment action that causes substantial and tangible harm, such as, but not limited to, a material change in the terms and conditions of employment. A plaintiff need not show that the employment action was retaliatory in order to establish that it meets the second prong of the McDonnell Douglas test, although the plaintiff, of course, will need to make such a showing to satisfy the third prong of the test. We hold, further, that while something less than an "ultimate employment action"[5] may be actionable, a plaintiff may seek redress through the courts only for final employment actions; i.e., those that are not subject to reversal or modification through internal review processes.

Causal Link Between Protected Activity and Employer's Action
For purposes of making a prima facie showing under the McDonnell Douglas test, the causal link element may be established by an inference derived from circumstantial evidence. A plaintiff can satisfy his or her initial burden under the test by producing evidence of nothing more than the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision. (Morgan v. Regents of University of California, supra, 88 Cal.App.4th at p. 69, 105 Cal. Rptr.2d 652.)
Such evidence, however, only satisfies the plaintiff's initial burden. "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation `drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (Akers, supra, 95 Cal.App.4th at p. 1453, 116 Cal.Rptr.2d 602.) The plaintiff must have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. The plaintiff's burden is to prove, by competent evidence, that the employer's proffered justification is mere pretext; i.e., that the presumptively valid reason for the employer's action was in fact a cover-up. (Perez v. County of Santa Clara (2003) 111 Cal.App.4th 671, 676, 3 Cal.Rptr.3d 867.)
In responding to the employer's showing of a legitimate reason for the complained-of action, the plaintiff cannot "`simply show the employer's decision was wrong, mistaken, or unwise. Rather, the employee "`must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *920 could rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [... asserted] non-discriminatory reasons." [Citations.]' [Citation.]"'" (Morgan v. Regents of University of California, supra, 88 Cal.App.4th at p. 75, 105 Cal.Rptr.2d 652.) "The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (Guz v. Bechtel National, Inc. (2000) 24 Cal.4th 317, 356, 100 Cal.Rptr.2d 352, 8 P.3d 1089.)

Actions Taken Against Dr. McRae

The Letter of Instruction
On May 13, 1997, Dr. Andreasen received notice that Dr. McRae had filed a complaint with the DFEH complaining that she had been denied the position of Chief Medical Officer at Solano Prison because of her race.[6] On May 16 and again on June 6, Dr. Andreasen sent memoranda to all physicians and surgeons, reminding them that they were expected to be at their posts during their rotations and that no exceptions could be made without the specific signed authorization of the CMO. On May 22, Dr. Andreasen wrote a note to his supervisory file on Dr. McRae, reporting that she had left her position as an emergency room physician to attend a meeting without securing adequate coverage for her position in the emergency room, without informing the CMO's office that she was leaving the emergency room or that she was in need of relief for a medical staff function.
On June 12, 1997, Dr. Andreasen wrote another memorandum to his supervisory file, stating that there were reports that Dr. McRae had been coming in at 9:30 a.m. when she was on duty at 8:00 a.m., and on one day had worked only from 9:30 a.m. to 10:40 a.m., without notifying the CMO's office that she was going to take time off. Dr. Andreasen wrote, further, that he had scheduled a meeting with Dr. McRae on June 9, apparently to talk about these reports, but Dr. McRae called in sick. Dr. Andreasen rescheduled the meeting for the following day, but Dr. McRae did not appear. She was paged and stated that she would not be able to attend the meeting because she was taking a training session. The meeting was rescheduled again, for the next day. Dr. McRae called in sick.
Dr. Andreasen then issued the "Letter of Instruction" to Dr. McRae on June 26, 1997. The letter reported that three days earlier, Dr. McRae had failed to notify her supervisor that she was leaving the job site, and had failed to report to her assigned post for emergency room coverage. Andreasen wrote that Dr. McRae's conduct violated provisions of the California Code of Regulations and Dr. Andreasen's own memoranda to all providers, dated May 16, 1997, and June 6, 1997. Dr. Andreasen instructed Dr. McRae to read and familiarize herself with the cited regulations and memoranda, and to notify her supervisor about any need to leave her job site or to report in late. Dr. McRae refused to accept or sign the letter, and Dr. Andreasen placed it his supervisory file.
There is no evidence that the letter of instruction resulted in any loss of pay, *921 status or job responsibilities to Dr. McRae. It was not a performance evaluation. There is no evidence that the letter itself could or did lead to any alteration of the terms and conditions of Dr. McRae's employment, or that its existence deprived her of any promotional opportunities. (Compare with Akers, supra, 95 Cal. App.4th at pp. 1456-1457, 116 Cal.Rptr.2d 602.)[7] We do not believe that a negative performance evaluation, even if unwarranted, can trigger an FEHA claim. Employee criticism is a useful and necessary tool that benefits not only the employer, but also the employee and the public. Although the FEHA seeks to prevent the chilling effect of retaliatory action, it should not be interpreted in a way that discourages employers from informing employees of any dereliction of duty, or of the need to improve their performance. The interest in allowing employers to take corrective action as needed, or to warn employees that their conduct may lead to an adverse employment action, requires an interpretation that tolerates the risk that an employee may be unable to seek redress through the FEHA for such criticism, even when that criticism in fact may be retaliatory.
Nor did the letter of instruction become an adverse employment action because it was attached to the investigation report and may have been a factor in the decision to suspend Dr. McRae for 30 days. Assuming that the decision to suspend was an adverse employment action (and for reasons we will state, we have concluded that it was not), and assuming, further, that the decision to suspend was based, in part, on the letter of investigation, the letter would be relevant to the question of whether the asserted reasons for the decision were pretextual. That written criticism leads to an adverse employment action, however, does not relate back so as to make the criticism itself an adverse employment action.
This does not mean that negative employment evaluations cannot be considered in deciding whether an employee has been subjected to an adverse employment action. A pattern of negative employment evaluations, or a negative employment evaluation accompanied by other conduct, might create a hostile work environment, providing grounds for a retaliation claim on that basis. In addition, adverse employment actions such as terminations, demotions, etc., may be based in part on unwarranted criticism. In such cases, the fact that the criticism is unwarranted will be a factor in deciding if the employer's motive for the adverse action is pretextual, but it is the later action, and not the criticism itself, that is the adverse employment action.
For all of these reasons we conclude that the letter of instruction, even if unwarranted or based on an improper motive, is not an adverse employment action.

The Investigation and Decision to Suspend
On January 27, 1998, Warden Anna Ramirez-Palmer filed an internal affairs investigation *922 request, alleging that (1) on December 16, 1997, Dr. McRae disobeyed two directives, issued by Dr. Andreasen, to contact the family of a patient inmate to report on the inmate's medical condition; (2) Dr. McRae had refused to provide medical information about the patient to another physician that would have allowed the patient to transfer to Hospice;[8] and (3) Dr. McRae acted improperly in connection with another patient inmate. As to the third allegation, Dr. Andreasen asserted that the patient had been admitted at a time when Dr. McRae was on duty. The patient had been diagnosed with pneumonia, and the admission orders called for intravenous antibiotics. Nursing staff could not find a vein that would sustain an IV, and called Dr. McRae, who, without examining the patient, gave a telephonic order to staff to delay giving antibiotics until IV access could be secured the following day. Dr. Andreasen alleged, further, that it appeared that Dr. McRae's decision contributed to the patient's subsequent respiratory failure.
On June 25, 1998, after receiving a report of the investigation and its findings, Warden Ramirez-Palmer recommended that Dr. McRae be suspended for 30 days. This recommendation was passed on to Donna Wilson, the Chief Deputy of Clinical Services, and from her to Dr. Susan Steinberg, the Deputy Director of Health Care Services Division, for final approval. Dr. Steinberg signed off on the proposed action on July 14, 1998, and a Statement of Adverse Action was drafted. The suspension, however, never was implemented, and while Dr. McRae was aware of the investigation, she did not know about the suspension until after she commenced this case.
A 30-day suspension would be an adverse employment action. Here, however, while there was a decision to suspend, the suspension never took place. By the time the decision had been reached, Dr. McRae was on nonindustrial disability leave. She returned to work nearly one year later, worked for two and one-half weeks, and left without ever learning of the decision to suspend. The record does not disclose whether there was any intention to implement that decision after Dr. McRae returned from nonindustrial disability leave. The decision to suspend Dr. McRae, therefore, had no actual impact on the terms and conditions of her employment. Moreover, the decision was not final. The notice of adverse action, prepared for Dr. McRae and signed by Dr. Wilson (but never sent to Dr. McRae), informed Dr. McRae that she had the right to contest the matter by stating her position in writing and/or requesting an interview with Dr. Wilson. Dr. Wilson explained that she had the discretion to alter the decision. Dr. McRae also had the right to appeal the decision to the State Personnel Board. A negative evaluation is not an adverse employment action when the plaintiff has the power to appeal, even if the plaintiff leaves his or her employment while an appeal of the evaluation is pending. "`To rule otherwise would be to encourage litigation before the employer has an opportunity to correct through internal grievance procedures any wrong it may have committed.'" (Brooks v. City of San Mateo, supra, 229 F.3d at p. 930.)
We find, therefore, that the 30-day suspension was not an adverse employment action as a matter of law. This is not to say that the investigation is irrelevant to Dr. McRae's claims of retaliation. *923 Evidence of an unfounded and retaliatory investigation, for example, like evidence of an unfounded and negative employment evaluation, might provide grounds for a claim of hostile work environment. We hold here only that the decision to suspend an employee is not itself an adverse employment action unless or until that decision is implemented.

The Transfer to Solano Prison
The confrontation between Dr. McRae and the two nurses was triggered by Dr. McRae's actions with respect to a "HEPA" air filter, a filter that destroys bacteria. The filter had been placed close to Dr. McRae's desk, and she was concerned that the filter might be leaking ultraviolet light, causing her injury. She filed a grievance, asking that the filter be moved. When the grievance was denied, Dr. McRae simply unplugged and moved the filter herself. A pattern apparently developed, where Dr. McRae would move the filter, and when she left the room, someone would move it back.
On the morning of April 16, 1998, Dr. McRae had moved the filter and was treating a patient at her desk. The two nurses, defendants Bruce Wiltse and Richard Burkhart, entered and confronted Dr. McRae about her actions. Mr. Burkhart moved the filter back, and plugged it in. Dr. McRae unplugged it. This happened three times. Dr. McRae telephoned Dr. Andreasen and another physician in the building, Dr. Kevin Geraghty, who also was her union steward. According to Dr. McRae, as she was telling Dr. Andreasen what had happened, Mr. Burkhart yelled, "Liar, liar," jabbed his finger at her face, and at one point touched her on the hand as she was attempting to shield her face from him. Dr. Geraghty testified that he came into the room at about that time. Dr. Andreasen was there, but did not appear to be doing anything. After Dr. Geraghty called Dr. Andreasen by name, Dr. Andreasen left the room with Mr. Wiltse and Mr. Burkhart. Dr. McRae testified that although Dr. Andreasen was present for a couple of minutes before Dr. Geraghty arrived, he took no action until Dr. Geraghty indicated that he was there. Dr. McRae went out on nonindustrial disability leave the next day, and sought a restraining order against Mr. Burkhart and Mr. Wiltse.
Approximately two weeks later, Dr. Wilson was hired as the Chief Deputy of Clinical Services at CMF. On July 29, 1998, Dr. Wilson wrote to Dr. McRae that her disability leave would expire on August 15, directing her to report to work at Solano Prison rather than to return to work at CMF. She wrote: "You are being transferred to Solano in an effort to resolve several of your safety concerns here at CMF. Your transfer to Solano will alleviate your concerns about working in close proximity to Mr. Wiltse and Mr. Burkhart and will resolve the Temporary Restraining Orders on file with the Solano County District Attorney's Office. Your transfer to Solano will also resolve your concerns regarding exposure to the HEPA FILTER and UV light, your concerns with the B-1 Clinic health hazards and inadequate B-1 office space. Your transfer to Solano will also resolve your concerns about having to perform MOD duty." Dr. McRae responded by filing a third DEFH complaint on August 18, 1998, asserting that the transfer was a retaliatory act, and requesting that the decision to transfer her be reversed. On August 25, Dr. Wilson reported back to Dr. McRae that her grievance had been denied. In March 1999, Dr. McRae reported to work at Solano Prison, but left within three weeks.
*924 There is no question but that a transfer can be an adverse employment action, when it results in substantial and tangible harm. It also is settled that an adverse employment action does not occur when the transfer is into a comparable position not resulting in substantial and tangible harm. (Akers, supra, 95 Cal. App.4th at p. 1457, 116 Cal.Rptr.2d 602.) The District of Columbia Circuit, in Brown v. Brody (D.C.Cir.1999) 199 F.3d 446, after surveying the relevant case law, stated a formulation that reflects our own view: "[A] plaintiff who is made to undertake or who is denied a lateral transfer  that is, one in which she suffers no diminution in pay or benefits  does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncrasies of personal preference are not sufficient to state an injury." (Id. at p. 457.)
This formulation was drawn, in part, from the opinion in Burlington Industries, Inc. v. Ellerth (1998) 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (Burlington), where the United States Supreme Court used the term "tangible employment action" to define actionable harm in discrimination cases, importing that term into its discussion of a vicarious liability issue. The Supreme Court held: "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Compare Crady v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 [7th Cir.1993] (`A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation'), with Flaherty v. Gas Research Institute, 31 F.3d 451, 456 [7th Cir.1994] (a `bruised ego' is not enough), Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 [6th Cir.1996] (demotion without change in pay, benefits, duties, or prestige insufficient), and Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 [8th Cir.1994] (reassignment to more inconvenient job insufficient)." (Burlington, supra, at p. 761, 118 S.Ct. 2257.)
The transfer of Dr. McRae from CMF to Solano Prison did not entail a demotion, a reduction in pay or a loss of benefits. It did not involve a change in status or a less distinguished title. There is no evidence that it involved any significant change in job responsibilities, or, except for on-call duty, in work hours or commute time.
Dr. McRae nonetheless successfully contended that the transfer was an adverse employment action, asserting that some aspects of the work at Solano Prison were more unpleasant to her than some aspects of employment at CMF, and also that Solano Prison presented a dangerous environment. For Dr. McRae to prevail on this point, the record must contain substantial evidence that Solano Prison in fact presented a less desirable work environment than CMF, and, further, that the change was not just somewhat less pleasant, but had materially adverse consequences comparable in significance to a demotion, a decrease in wages or salary, a less distinguished title, a material loss of *925 benefits, or significantly diminished responsibilities.
"In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. [Citation.] We may not substitute our view of the correct findings for those of the trial court [or jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [fact-finder's] decision. However, we may not defer to that decision entirely. `[I]f the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.]"
"Although each case must be judged for sufficient evidence on its own peculiar circumstances, a number of general guidelines may be set forth. First, a judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.] And although an appellate court will normally defer to the trier of fact's drawing of inferences, it has been said: `To these well settled rules there is a common sense limited exception which is aimed at preventing the trier of the facts from running away with the case. This limited exception is that the trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men. The trier of the facts may not believe impossibilities.'" (Beck Development Co. v. Southern Pacific Transportation Co. (1996) 44 Cal.App.4th 1160, 1203-1204, 52 Cal.Rptr.2d 518.)
Dr. McRae testified that she was aware that Solano Prison had a reputation among physicians as one of the worst facilities in the system, and physicians were sent there before they were dismissed. Dr. McRae, however, produced no evidence that anyone else was aware of this reputation. In other words, while Dr. McRae stated her own belief that Solano Prison had a poor reputation, she produced no evidence that it in fact had a poor reputation. In addition, she produced no evidence that the Department routinely sent physicians there as a step towards dismissal, and her claim on this point is undermined by the fact that she actively sought a position at that facility.
Dr. McRae testified that she was unable to get a lab coat at Solano Prison, and had to wear a paper gown to keep her clothing clean. Dr. McRae had her own desk while working at CMF, but claimed she had no desk or specific workplace at Solano Prison, and sometimes had to use a stand ordinarily used to hold medical instruments. One of the other doctors allowed her to use his office on occasion, and sometimes she used the treatment room as an office. A nurse there complained that she was using his desk. Dr. McRae's testimony was corroborated, somewhat, by the testimony of Barbara Clayton, the Department's *926 northern regional health service administrator. Ms. Clayton confirmed that space was limited at Solano Prison, that there were only two actual treatment areas for doctors in the primary area and that four doctors were assigned to work in those areas. As a result some of the doctors worked out of the emergency room or shared space.
There is little question but that the lack of a lab coat or the need to share a desk would have been inconvenient and irritating. On the other hand, work at CMF exposed Dr. McRae to the HEPA filter and to two nurses against whom she had sought a restraining order, and required her to work under a supervisor she felt did not support her. Even assuming, however, that the overall environment at CMF was more pleasant for Dr. McRae than the environment at Solano Prison, matters such as the lack of a lab coat or a desk do not compare in significance with matters such as demotions, loss of pay or benefits, or harassment in the workplace. In short, they do not amount to a tangible injury supporting a claim of adverse employment action.
Dr. McRae also complained of the differences in on-call duty required by CMF and Solano Prison. At CMF, Dr. McRae was required to spend two to four nights per month at the hospital. At Solano Prison, she was required to be on-call for a full week at a time. Dr. McRae claimed that physicians on this duty had to be within a 30-minute response of the institution. As she lived more than 30 minutes away, Dr. McRae asserted that she would have to move out her home for about a week, live in a motel, eat in restaurants and arrange for the care of her dog, and would have to bear the expense of these items.
Dr. McRae, however, did not prove the truth of her assertions. She produced no evidence of an order or policy requiring on-call physicians to arrive at the facility within 30 minutes of a call. She also produced no evidence that any Solano Prison physician had actually moved out of his or her home during the week of on-call duty, or that there had been any complaints that a physician had failed to arrive at the facility within 30 minutes of being called.
As evidence supporting her claim, Dr. McRae cites her own testimony, where she stated her belief that on-call physicians had to be within a 30-minute response time of the institution. Dr. McRae explained, further, "I don't recall specifically who told me that, but I think it was Dr. Ziesma [who, Dr. McRae stated, was in a supervisory position]. I believe the other doctors may have said it, too, but the response time for emergencies was 30 minutes. It may have been even less than that, but I don't think it was more than 30 minutes. If there was an emergency at the facility, the physician on duty had to get there within 30 minutes was my understanding."
Dr. McRae also cites the collective bargaining agreement between the State of California and the Union of American Physicians and Dentists. As relevant, the agreement provided that the on-call assignment was a work shift of seven consecutive days in which the employee is available by telephone or electronic paging device at all times, and "normally immediately available to return to the facility." Employees would be entitled to pay for every hour actually worked plus one hour for travel time.
Dr. McRae's opinion, or even the opinion of a supervising physician, has no probative value absent a showing that the opinion is based on fact. The collective bargaining agreement required only that the *927 employee be "immediately available to return to the facility." "Immediately available to return" suggests that the employee must be prepared to drop whatever he or she might be doing immediately, and return. Dr. McRae did not establish that the agreement required her, or any other physician, to be able return within any particular period of time. That an employee will be paid for no less and no more than one hour of travel time is not a mandate that the employee be within 30 minutes of the facility.
The Department introduced evidence that Dr. McRae's beliefs were unfounded. Ms. Clayton, the Department's northern regional health service administrator, who also had been the labor liaison from 1994 until 1999, and was the person who dealt with collective bargaining issues, testified that there was no requirement that an on-call physician had to be within 30 minutes of the facility. She explained that on-call duty at Solano Prison meant that nursing staff would contact the on-call physician if there were an emergency, if staff needed to receive orders about a patient or it was necessary for the physician to come in. Most of the facility's physicians lived out of the area. Most of the time they would not come in, but would make telephone orders. Solano Prison was not licensed for acute care, so a physician would not need to return even if a serious emergency arose. The physician instead would order the patient sent to another facility. The Department's evidence, therefore, was that on-call physicians were not required to be within 30 minutes from the prison at all times during periods of on-call duty, and Dr. McRae's evidence provided no valid basis for concluding otherwise.
Dr. McRae also complained that Solano Prison provided a more dangerous work setting than CMF. Neither side produced much evidence on the relative safety of either facility, and Dr. McRae's stated concerns about safety are somewhat undermined by the fact that she actively sought employment at Solano Prison. Both facilities house prisoners, and both facilities, therefore, have safety issues. CMF houses inmates at all levels, including those at level 4, who are considered to be more dangerous than the general prison population. CMF also provides secured housing units for inmates who have been segregated from the general population because of their violent conduct. Solano Prison, in contrast, houses only level 2 and 3 inmates, who are considered to be only medium custody inmates. Solano Prison, which was built more recently than CMF, has gun towers and an observation area in the housing unit facing the yard, both of which are manned by armed correctional officers. There is an armed entryway into the prison. There is no similar protection for staff at CMF.
Ms. Clayton explained: "Solano has more visible uniform staff than ... CMF. CMF is a closed quarter, which is maybe the width of this room, maybe a little bit wider, where you have staff and inmates who are in the same general area. The only protection for staff is that they have  they are supposed to walk in this marked off area, which is in the center corridor, which is white lines in the center of the corridor, and the staff are to walk within that area, and that is supposed to be their protection there at CMF."
This evidence does not establish, or even allow an inference, that Solano Prison provides a more dangerous environment than CMF. To the contrary, the evidence supports the conclusion that Solano Prison provides a safer work environment than the environment at CMF.
*928 Dr. McRae testified that she felt fear for her safety because she believed she lacked the support and protection of the administration. This was based, in part, on her experience at CMF, and, in part, on the failure to provide her with an orientation after she began working at Solano Prison. Dr. McRae explained that an orientation would have dealt with safety issues, including "what areas you may and may not walk into; what it means when there is a yard down; what kind of special rules are in effect for employees at that particular facility to ensure [their] safety." Dr. McRae testified, further, that she had received information that an orientation was very important and that it was to take place quite soon after a person came on duty. When she complained that she had not had an orientation, she was told, simply, that one would be scheduled. Dr. McRae explained, further, that she had concluded that the administration at Solano Prison would not support her because it had failed to provide her with a lab coat and a desk and there had been a complaint about her use of the common workspace.
Dr. McRae's testimony does not support a finding that the transfer compromised her safety. The evidence is that CMF and Solano Prison do not share administrations. That Dr. McRae was not supported at CMF, therefore, would not mean that she would lack support at Solano Prison. As Dr. McRae was transferred from CMF to Solano Prison, she was transferred away from employees and administration she believed to be hostile to her. In addition, even if Dr. McRae's troubles at CMF meant that she lacked support at Solano Prison, her complaint is with the administration of both facilities, and does not support a claim that the transfer compromised her safety, at least in the absence of some evidence that Solano Prison was in fact a more dangerous environment so that the lack of support would be felt more acutely.
As to the orientation, Dr. McRae was at Solano Prison for only two and one-half weeks. Ms. Clayton, although testifying that orientations were given to employees as soon as possible after they reported to work, also testified that orientations generally were given once a month. In the meantime, employees received on-the-job training. The purpose of an orientation was to familiarize the employee with the setting and explain how to function within it, including how to work safely. As orientations are standard, an orientation would have been review for Dr. McRae, who had worked for six years at CMF. On-the-job training would cover matters such as physical layout. Dr. McRae produced no evidence contradicting Ms. Clayton's testimony. The evidence, therefore, does not establish either that Dr. McRae was denied an orientation, or that the failure to provide her with one rendered the job unsafe.
As noted above, an employment action is not an adverse employment action unless it results in a materially adverse change in employment conditions comparable to a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits or significantly diminished material responsibilities. (Brown v. Brody, supra, 199 F.3d at pp. 456-457.) On our review of the record as a whole, resolving all factual differences in favor of the jury's verdict, and drawing all reasonable inferences from the evidence, we cannot find substantial evidence that the transfer of Dr. McRae from CMF to Solano Prison amounted to an adverse employment action.
We have not considered whether Dr. McRae met her burden of showing that *929 the letter of instruction or unimplemented decision to suspend her were causally connected to her protected activity of filing DFEH complaints, as we have concluded there is no reason to conclude that either action was an adverse employment action. While we have concluded that the transfer of Dr. McRae from CMF to Solano prison is not an adverse employment action, it did result in physical changes in her employment environment. We have, therefore, also reviewed the evidence in light of the third prong of the McDonnell Douglas test.
The Department proffered a compelling reason for transferring Dr. McRae to Solano Prison  her relationship with other CMF employees had so deteriorated that she had sought a restraining order against them and had taken nonindustrial leave in mid-April, and did not return to work until nearly a year later. Under those circumstances, the decision to transfer Dr. McRae into a new work environment away from the other employees has at least the appearance of a reasonable management decision.
The burden, therefore, shifted to Dr. McRae to produce competent evidence that the Department's proffered reason for the transfer was pretextual, by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions as to allow the jury to find it unworthy of credence. (Morgan v. Regents of University of California, supra, 88 Cal.App.4th at p. 75, 105 Cal.Rptr.2d 652.) Dr. McRae did not meet that burden. She made no showing that the Department routinely, or indeed ever, punished persons for filing FEHA complaints by transferring them to other, less favorable, assignments. She did not and could not show that the Department had no legitimate reason for her transfer. Her argument, rather, focused on her claim that the Department should have taken some other action to alleviate her problems at CMF, such as disciplining or transferring the two nurses. That some other action might have addressed the Department's concerns does not establish that the Department's stated reasons for the transfer were pretextual. Moreover, Dr. McRae's problems at CMF were not limited to her confrontation with the two nurses. Transferring the nurses, accordingly, would have solved some of the Department's problems, but would not have resolved Dr. McRae's complaints about Dr. Andreasen or the HEPA filter.
In short, there simply is no reason to conclude from the evidence that the decision to transfer Dr. McRae was the result of a wish to retaliate against her for filing grievances, as opposed to the wish to remove her from an environment where she could not function effectively.

Pattern of Conduct
Dr. McRae contends that even if the evidence does not show that any single action taken by the Department was an adverse employment action, the Department's actions, taken together, established a pattern of conduct that the jury could have deemed to be an adverse employment action.
Dr. McRae did not try her case on a theory of hostile work environment, and the evidence, while reflecting isolated incidents of unpleasantness, does not show the kind of severe and pervasive harassment that permits recovery on such a theory. (See Aguilar v. Avis Rent A Car System, Inc. (1999) 21 Cal.4th 121, 130-131, 87 Cal.Rptr.2d 132, 980 P.2d 846.) Thompson *930 v. Tracor Flight Systems, Inc. (2001) 86 Cal.App.4th 1156, 104 Cal.Rptr.2d 95, cited by Dr. McRae, did not involve an adverse employment action. It was a wrongful discharge case, where the court simply recognized that conduct amounting to a hostile work environment would support a finding of constructive discharge. (Id. at pp. 1171-1172, 104 Cal.Rptr.2d 95.) The court in Akers, supra, 95 Cal.App.4th 1441, 116 Cal.Rptr.2d 602, found that a negative evaluation and a counseling memorandum, taken together, had the result of denying the plaintiff any opportunities for promotion. It followed that the evidence allowed a finding that the plaintiff had suffered an adverse employment action. (Id. at p. 1456, 116 Cal.Rptr.2d 602.) It was the denial of the opportunity for promotion, however, and not the pattern of conduct, that provided a valid basis for the plaintiff's FEHA claim. Dr. McRae has not shown that the Department's actions, whether taken alone or in combination, had a similar effect.

CONCLUSION
In conclusion, viewing the evidence in the light most favorable to the jury's findings, including all reasonable inferences that might be drawn therefrom, we nonetheless find that Dr. McRae failed to show she suffered an adverse employment action, whether the conduct she complains of is considered separately or cumulatively. Because we find that Dr. McRae failed to establish the second prong of the McDonnell Douglas test, we need not reach the question of whether she produced sufficient evidence to rebut the Department's showing of legitimate, nondiscriminatory reasons for the actions it took. Nonetheless, we also find that the Department produced evidence of a valid, nonretaliatory reason for its decision to transfer Dr. McRae to Solano Prison, and that Dr. McRae did not meet her burden of showing that the Department's reason was pretextual.
The judgment, therefore, is reversed.
The orders awarding Dr. McRae postjudgment and prejudgment attorney fees are reversed.
The order awarding costs to the individual defendants is affirmed. The matter is remanded to the trial court to award costs to the Department, to the extent that those costs are not duplicative of costs already awarded to the individual defendants.
The defendants are awarded their costs on appeal.
We concur: SWAGER and MARGULIES, JJ.
NOTES
[1] The trial court reasoned that since there were five defendants, each would be awarded one-fifth of the costs. Dr. McRae contends that the Department actually paid all of the costs; therefore, the court erred in awarding costs to the individual defendants. As we reverse the judgment, Dr. McRae will be responsible for all of the disputed costs, whether they were paid by the Department or by the individual defendants. There is therefore no reason for us to decide how those costs should be divided among the various defendants.
[2] Dr. McRae is African-American.
[3] In April 1998, Dr. McRae had a verbal confrontation with two registered nurses, one of whom called her a liar and, according to Dr. McRae, jabbed his finger at her, touching her hand as she attempted to shield her face. Dr. McRae believed that Dr. Andreasen did not take appropriate action to protect her during the confrontation, and did not support her during its aftermath. Dr. McRae went out on nonindustrial disability leave the next day, and sought a restraining order against the two nurses.
[4] Dr. McRae, citing two exhibits, asserts that she requested that medical staff conduct a peer review of her cases, and that medical staff exonerated her. The exhibits show only that she sent a letter to the Medical Executive Committee asking if her conduct had failed to meet the standard of care, and had received the response that she had "no pending peer review issues." She was not exonerated; she simply never was investigated for failing to meet the standard of care.
[5] Certain courts, among them those of the Fifth and Eighth Circuits, take the position that only "ultimate employment decisions," such as firing, demotion or a reduction in pay, are sufficient to state a retaliation claim. (Mattern v. Eastman Kodak Co. (5th Cir.1997) 104 F.3d 702, 707; Ledergerber v. Stangler (8th Cir.1997) 122 F.3d 1142, 1144.)
[6] Notice was provided by a letter addressed to Dr. Andreasen from the DFEH. Dr. Andreasen testified that he did not recall seeing the letter, and was not aware that Dr. McRae had filed a DFEH complaint when he issued the letter of instruction. He assumed that he had forwarded the DFEH letter to the legal office, believing that it did not apply to him. For purposes of our discussion here, we assume that Dr. Andreasen did in fact receive notice of Dr. McRae's complaint.
[7] The threat that an employer might retaliate by issuing a letter of instruction which might deter an employee from engaging in protected activity, could be an adverse action under the "deterrence test" adopted by the Ninth Circuit. (See Brooks v. City of San Mateo, supra, 229 F.3d at p. 928; Yartzoff v. Thomas (9th Cir.1987) 809 F.2d 1371, 1375-1376.) In California, however, a mere oral or written criticism of an employee does not meet the definition of an adverse employment action under FEHA (Akers, supra, 95 Cal.App.4th at p. 1457 & fn. 4, 116 Cal.Rptr.2d 602.)
[8] It appears that, early into the investigation, the second allegation was found to be untrue.